1  ROBBINS ARROYO LLP
2  BRIAN J. ROBBINS (190264)
   brobbins@robbinsarroyo.com
3  KEVIN A SEELY (199982)
   kseely@robbinsarroyo.com
4  ASHLEY R. RIFKIN (246602)
   arifkin@robbinsarroyo.com
5  STEVEN M. MCANY (271405)
   smckany@robbinsarroyo.com
6  600 B Street, Suite 1900
   San Diego, CA 92101
7  Telephone: (619) 525-3990
   Facsimile: (619) 525-3991
8
9  Attorneys for Plaintiff

10              UNITED STATES DISTRICT COURT

11             CENTRAL DISTRICT OF CALIFORNIA

12                  SOUTHERN DIVISION

13
   ARNAUD VAN DER GRACHT DE          )  Case No.
14 ROMMERSWAEL, Derivatively on      )
   Behalf of PUMA BIOTECHNOLOGY,     )
15 INC.,                             )
                                     )  VERIFIED STOCKHOLDER
16                      Plaintiff,   )  DERIVATIVE COMPLAINT FOR
                                     )  VIOLATION OF SECURITIES
17         v.                        )  LAW, BREACH OF FIDUCIARY
                                     )  DUTY, WASTE OF ORPORATE
18 ALAN H. AUERBACH, CHARLES R.      )  ASSETS, AND UNJUST
   EYLER, JAY M. MOYES, TROY E.      )  ENRICHMENT
19 WILSON, ADRIAN M.                 )
   SENDEROWICZ, FRANK E. ZAVRL,      )
20 and THOMAS R. MALLEY,             )
                                     )
21                      Defendants,  )
                                     )
22                                   )
           -and-                     )
23                                   )
   PUMA BIOTECHNOLOGY, INC., a       )
24 Delaware corporation,             )
                                     )
25                 Nominal Defendant. )
                                     )
26                                   )  DEMAND FOR JURY TRIAL
27
28

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1. This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Puma Biotechnology, Inc. ("Puma" or the "Company") against certain of its officers and directors for violation of securities law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. These wrongs resulted in hundreds of millions of dollars in damages to Puma's reputation, goodwill, and standing in the business community. Moreover, these actions have exposed Puma to hundreds of millions of dollars in potential liability for violations of state and federal law.

2. Founded in 2010, Puma is a biopharmaceutical company that seeks to acquire and develop drugs to treat certain forms of cancer. Currently, NERLYNX™ ("neratinib") is the only drug product marketed by the Company. Neratinib is designed to treat patients with human epidermal growth factor receptor 2 ("HER2")-positive breast cancers.

3. In order to sell neratinib in the United States, it first had to receive approval from the U.S. Food and Drug Administration ("FDA"). The FDA, in turn, requires drugs to show their efficacy and safety through a series of clinical trials. The pharmaceutical company Wyeth initiated a clinical trial for neratinib, in April 2009, called the "ExteNET" trial. ExteNET trial researchers enrolled 2,821 HER2-positive breast cancer patients in the trial. In 2011, following Wyeth's merger with Pfizer, Pfizer agreed to license neratinib to Puma. As a result of this agreement, Puma assumed sole responsibility over the development of neratinib, including the ExteNET trial.

4.      The goal of conducting the ExteNET trial was to show that patients who had been given neratinib for one year (the "neratinib group") had a higher disease-free survival ("DFS") rate than patients who had been given placebos for one year (the "placebo group").[1]

5.      On July 17, 2014, Puma's Senior Director of Clinical Science, Alvin Wong ("Wong"), e-mailed the Company's Chief Executive Officer, defendant Alan H. Auerbach ("Auerbach"), and other Company executives a document containing disastrous clinical trial results for neratinib.  In particular, Wong's e-mail revealed that the DFS rate for the patients in the neratinib group was a mere 2.3% higher than the DFS rate for the patients in the placebo group.  The following day, Wong e-mailed defendant Auerbach and other Puma executives a PowerPoint presentation informing them that nearly 40% of neratinib group patients experienced grade 3 or 4 diarrhea.[2]  Moreover, due to this harmful side effect and other adverse events almost 30% of neratinib group patients dropped out of the ExteNET trial.

6.      Rather than disclosing these disappointing ExteNET trial results to the public, however, the Individual Defendants (as defined herein) repeatedly made improper statements about the drug's safety and efficacy.[3]  On July 22, 2014, less than a week after receiving

---

[1] A DFS rate is a scientific statistical term used to describe the proportion of patients who survive and show no sign of a disease after finishing treatment.  The primary metric used to evaluate DFS rates is the "absolute difference" between the DFS rates for neratinib and placebo group patients.  The absolute difference in DFS rates between neratinib and placebo group patients is determined by calculating the difference between the DFS rate for patients in the neratinib group and the DFS rate for patients in the placebo group.

[2] Diarrhea adverse events are measured on a scale of grade 1 (least severe) to grade 5 (most severe) based on the nature and severity of a patient's experience.  Patients are deemed to have grade 3 diarrhea when they experience more than seven bowel movements a day above their individual baselines, if they experience incontinence, or if their experience of diarrhea leads to hospitalization.  Patients with grade 4 diarrhea experience life-threatening health risks.

[3] Wong's July 17, 2014 and July 18, 2014 e-mails and their contents are referenced in the federal securities class action first amended complaint against Puma entitled, *Hsu v. Puma Biotechnology, Inc., et al.*, No. 15-CV-00865-AG-JCG (C.D. Cal. June 6, 2017) (the "Securities Class Action").  In their answer to the first amended complaint, defendants

Wong's e-mails regarding the ExteNET trial's disheartening results, the Company issued a press release claiming that the Individual Defendants were "very pleased" with the results of the ExteNET trial.  The press release further claimed that the trial "demonstrated that treatment with neratinib resulted in a 33% improvement in disease free survival versus placebo."  During a conference call with analysts and investors that took place later that day, defendant Auerbach explained that this 33% DFS improvement statistic was based on a supposed 4-5% absolute DFS rate increase in neratinib group patients compared to placebo group patients.  In addition, defendant Auerbach incorrectly asserted that the Kaplan-Meier curves[4] for the ExteNET trial, which charted the DFS rates of both patient groups, were widening over time, which would indicate that the DFS rate of patients taking neratinib was increasing over the DFS rate of patients in the placebo group.

7.     Defendant Auerbach also incorrectly asserted that Puma had not yet seen the safety results of the ExteNET trial.  Moreover, he made the inaccurate claim that patient drop outs due to adverse events "should be somewhere in the 5% to 10% range."  On July 23, 2014, the day following the above-described improper statements, Puma's market capitalization experienced an astonishing increase of over $5 billion.

8.     Over the next several months, the Company continued to lead investors to believe that neratinib usage led to a 4-5% absolute increase in DFS rate for neratinib group patients.  Defendant Auerbach also cited the misleading statistic that taking neratinib led to a 33% improvement in DFS during conference calls and in SEC filings, including the Company's Annual Report on Form 10-K for the 2014 fiscal year.

9.     Puma began to reveal the truth when it posted a summary report containing the true and accurate clinical results for the ExteNET trial on the website for the American Society of Clinical Oncology ("ASCO") on May 13, 2015.  The summary report was entitled

---

admitted that the first amended complaint accurately described the data contained in Wong's e-mails.

[4] Kaplan-Meier curves chart disclosed absolute DFS rate differences between patients who have been treated with a drug and patients who have been given placebos.

Abstract #508[5] and revealed that the true absolute DFS rate difference between neratinib and placebo group patients was a dismal 2.3%, approximately half as much as Puma had been claiming for almost a year. Puma's disclosure of Abstract #508 caused the Company to incur a one-day market capitalization loss of over $1.2 billion.

10.    The truth was further revealed on June 1, 2015, when Dr. Arlene Chan, one of the authors of Abstract #508, disclosed additional results of the ExteNET trial at the annual ASCO meeting. Dr. Chan's presentation confirmed that there was only a 2.3% absolute DFS rate difference between the neratinib and placebo group patients and disclosed the Kaplan-Meier curves for the ExteNET trial for the first time. Contrary to defendant Auerbach's representation that the Kaplan-Meier curves for the neratinib and placebo group patients were separating, the infographic showed that the curves had begun to narrow by the end of the two-year observation period. The narrowing of these curves indicated that the absolute DFS rate difference between the neratinib and placebo groups was ***decreasing***.

11.    The presentation also revealed that 16.8% of the neratinib group patients discontinued treatment due to the severe diarrhea they experienced as a result of taking neratinib. This disclosure contradicted defendant Auerbach's representation that only 5% to 10% of these patients would discontinue treatment due to adverse events. Puma incurred a two-day market capitalization loss of over $1.5 billion following Dr. Chan's disclosure of these additional disappointing ExteNET trial results.

12.    As a direct result of the Individual Defendants' wrongful course of conduct, on June 3, 2015, Puma investors filed the Securities Class Action against the Company). On September 30, 2016, U. S. District Court Judge Andrew J. Guilford issued an order in the Securities Class Action, denying the motion to dismiss filed by Puma, defendant Auerbach, and defendant Charles R. Eyler ("Eyler"), the Company's Treasurer and Senior Vice President, Finance and Administration. Judge Guilford held that plaintiffs had stated a claim against these defendants.

---

[5] An Abstract is a brief summary of a research article, thesis, or clinical study. Abstract #508 was posted on www.abstract.asco.org.

13.     The Securities Class Action filed their first amended complaint on June 6, 2017. Judge Guilford denied the defendants' motion to dismiss the first amended complaint for the same reason he denied the defendants' previous motion to dismiss.  Furthermore, he issued an order granting the plaintiffs' motion for class certification on December 8, 2017.  As a result of these rulings, there is a strong likelihood that the Individual Defendants' misconduct and improper statements regarding neratinib will cause Puma to incur substantial liability.

14.     Moreover, Puma's Board of Directors (the "Board") negligently issued misleading Proxy Statements in 2015 and 2017.  Defendants Auerbach, Thomas R. Malley ("Malley"), Jay M. Moyes ("Moyes"), and Troy E. Wilson ("Wilson") (the "2015 Proxy Defendants") negligently issued the first misleading Proxy Statement (the "2015 Proxy") on April 30, 2015.  On April 28, 2017, defendants Auerbach, Moyes, Wilson, Adrian M. Senderowicz ("Senderowicz") and Frank E. Zavrl ("Zavrl") (the "2017 Proxy Defendants") negligently issued another misleading Proxy Statement (the "2017 Proxy").

15.     The 2015 Proxy contained proposed amendments to the 2011 Incentive Award Plan that would authorize four million additional shares to be awarded under the plan.  The 2015 Proxy Defendants claimed that the proposed amendment was important to Puma's "continued growth and success."  However, this claimed "growth and success" was false as shown by the undisclosed results of the ExteNET trial.  Moreover, in support of reelecting various directors to the Board, the 2015 Proxy represented that the Board and its Audit Committee were actively engaged in the oversight, assessment, and management of risks facing the Company.  The Board, however, had utterly failed to prevent the occurrence of the obvious financial and legal risks associated with the Company's improper statements about neratinib.

16.     Similarly, in support of reelecting various Board members, the 2017 Proxy Defendants included an identical representation that the Board and its Audit Committee were actively engaged in the oversight, assessment, and management of risks facing the Company. However, at the time the 2017 Proxy was issued, the Board had not taken any steps to prevent the Individual Defendants or other Puma representatives from further damaging the Company

by making improper statements.  To make matters worse, many of the directors who participated in that misconduct were still on the Board when the 2017 Proxy was issued, including defendant Auerbach.  Similarly, defendant Eyler maintained his position as a Puma Senior Vice President and Treasurer despite his engagement in wrongdoing.

17.     Plaintiff sent his litigation demand letter (the "Litigation Demand") to the Board on August 29, 2017.  The Litigation Demand detailed the improper statements described herein and demanded that "independent and disinterested directors with the assistance of independent outside legal counsel" investigate this misconduct.  Plaintiff also demanded that the Company take legal action against the individual responsible for the improper statements and other wrongdoing.  A true and correct copy of the Litigation Demand is attached hereto as Exhibit A.

18.     After months of unproductive correspondences with Puma's Vice President of Finance and Accounting, plaintiff's Litigation Demand was rejected by the Board through a letter dated January 9, 2018.  This rejection was made in bad faith and was not the result of a good faith and independent investigation.  According to the letter, the Board did not initiate an investigation of the wrongdoing detailed in the Litigation Demand.  Instead, the Board based its decision to reject the Litigation Demand on a biased investigation previously conducted by counsel for Puma to develop a defense in the Securities Class Action and other documents and materials provided by counsel.  As a result of this obvious conflict of interest, the Board did not perform a good faith, independent investigation of the claims contained in the Litigation Demand.  Accordingly, the Board's rejection of the Litigation Demand was wrongful and outside the ambit of the business judgment rule.

19.     Plaintiff now brings this action against the Individual Defendants to repair the harm that they caused with their faithless actions.

**JURISDICTION AND VENUE**

20.     Pursuant to 28 U.S.C. §1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims  asserted herein  for violations  of  section  14(a)  of  the  Exchange  Act  and  SEC  Rule  14a-9  promulgated

thereunder.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

21.     Jurisdiction is also conferred by 28 U.S.C. §1332.  Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interests and costs.

22.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

23.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because: (i) Puma maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

24.     Plaintiff Arnaud van der Gracht de Rommerswael is currently a stockholder of Puma, became a stockholder while defendants were engaged in the wrongdoing described herein, and before any such wrongdoing became public, and has continuously been a stockholder since acquiring his stock.  Plaintiff is a citizen of Belgium.

**Nominal Defendant**

25.     Nominal defendant Puma is a Delaware corporation with principal executive offices located at 10880 Wilshire Boulevard, Suite 2150, Los Angeles, California.  Accordingly, Puma is a citizen of Delaware and California.  Puma is a biopharmaceutical company focused on the acquisition and development of therapeutics for the treatment of cancer.  The Company in-licenses the development and commercialization rights to three drug

candidates that are undergoing or have already completed initial clinical testing.  As of December 31, 2016, the Company had 160 employees.

**Defendants**

26.     Defendant Auerbach is Puma's President, Chief Executive Officer, Chairman of the Board, and a director and has been since October 2011.  Defendant Auerbach was also the President, Chief Executive Officer, Chairman of the Board, and a director of the privately held predecessor of the Company, also Puma Biotechnology, Inc., from September 2010 to October 2011.  Defendant Auerbach founded Puma in September 2010.  Defendant Auerbach is named in the related Securities Class Action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Auerbach knowingly or recklessly, or with gross negligence caused or allowed the Individual Defendants to make improper statements about neratinib's safety and efficacy.  Defendant Auerbach also negligently violated section 14(a) of the Exchange Act by causing Puma to make misleading statements in the 2015 Proxy and 2017 Proxy.  Puma paid defendant Auerbach the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | All Other Compensation | Total |
|------|--------|-------|--------------|---------------|------------------------|-------|
| 2016 | $705,994 | $542,707 | $8,152,500 | $1,442,662 | $13,840 | $10,857,703 |
| 2015 | $651,000 | $343,372 | - | $6,838,394 | $11,260 | $7,844,026 |
| 2014 | $610,000 | $305,000 | - | $16,876,576 | $11,030 | $17,802,606 |

Defendant Auerbach is a citizen of California.

27.     Defendant Eyler is Puma's Senior Vice President, Finance and Administration and Treasurer and has been since October 2011.  Defendant Eyler was also the Senior Vice President, Finance and Administration and Treasurer of the privately held predecessor of the Company, also Puma Biotechnology, Inc., from September 2011 to October 2011.  Defendant Eyler is named in the related Securities Class Action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Eyler knowingly, recklessly, or with gross negligence caused or allowed the Individual Defendants to make improper statements about neratinib's safety and efficacy.  Puma paid defendant Eyler the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | All Other Compensation | Total |
|------|--------|-------|--------------|---------------|------------------------|-------|
| 2016 | $384,244 | $207,255 | $570,675 | $649,195 | $14,023 | $1,825,392 |
| 2015 | $344,472 | $139,580 | - | $1,417,795 | $17,458 | $1,919,305 |
| 2014 | $304,336 | $123,099 | - | $4,061,879 | $15,734 | $4,505,048 |

Defendant Eyler is a citizen of California.

28.    Defendant Moyes is a Puma director and has been since April 2012.  Defendant Moyes was also the Chairman of Puma's Audit Committee from at least April 2016 to at least April 2017 and a member of that committee from at least April 2013 to at least April 2017. Defendant Moyes knowingly or recklessly caused or allowed the Individual Defendants to make improper statements about neratinib's safety and efficacy.  Defendant Moyes also negligently violated section 14(a) of the Exchange Act by causing Puma to make misleading statements in the 2015 Proxy and 2017 Proxy.  Puma paid defendant Moyes the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|-------------|-------------------|---------------|-------|
| 2014 | $50,000 | $1,125,105 | $1,175,105 |
| 2015 | $50,000 | $1,446,478 | $1,496,478 |
| 2016 | $50,000 | $246,397 | $296,397 |

Defendant Moyes is a citizen of California.

29.    Defendant Wilson is a Puma director and has been since October 2013. Defendant Wilson was also a member of Puma's Audit Committee from October 2013 to at least April 2017.  Defendant Wilson knowingly or recklessly caused or allowed the Individual Defendants to make improper statements about neratinib's safety and efficacy.  Defendant Wilson also negligently violated section 14(a) of the Exchange Act by causing Puma to make misleading statements in the 2015 Proxy and 2017 Proxy.  Puma paid defendant Wilson the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|-------------|-------------------|---------------|-------|
| 2014 | $50,000 | $1,125,105 | $1,175,105 |
| 2015 | $50,000 | $927,861 | $977,861 |
| 2016 | $50,000 | $246,397 | $296,397 |

1  Defendant Wilson is a citizen of California.

2       30.     Defendant Senderowicz is a Puma director and has been since August 2015.

3  Defendant Senderowicz negligently violated section 14(a) of the Exchange Act by causing

4  Puma to make misleading statements in the 2017 Proxy.  Puma paid defendant Senderowicz

5  the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2015 | $12,500 | $2,675,453 | $2,687,953 |
| 2016 | $50,000 | $440,063 | $490,063 |

9  Defendant Senderowicz is a citizen of Massachusetts.

10       31.     Defendant Zavrl is a Puma director and has been since September 2015.

11  Defendant Zavrl was also a member of Puma's Audit Committee from September 2015 to at

12  least April 2017.  Defendant Zavrl negligently violated section 14(a) of the Exchange Act by

13  causing Puma to make misleading statements in the 2017 Proxy.  Puma paid defendant Zavrl

14  the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2015 | $12,500 | $2,644,542 | $2,657,042 |
| 2016 | $50,000 | $440,063 | $490,063 |

18  Defendant Zavrl is a citizen of Massachusetts.

19       32.     Defendant Malley was a Puma director from October 2011 to September 2015.

20  Defendant Malley was also the Chairman of Puma's Audit Committee and a member of that

21  committee from at least April 2013 to September 2015.  Defendant Malley knowingly or

22  recklessly caused or allowed the Individual Defendants to make improper statements about

23  neratinib's safety and efficacy.  Defendant Malley also negligently violated section 14(a) of

24  the Exchange Act by causing Puma to make misleading statements in the 2015 Proxy.  Puma

25  paid defendant Malley the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2014 | $50,000 | $1,125,105 | $1,175,105 |
| 2015 | $37,500 | - | $37,500 |

Defendant Malley is a citizen of Colorado.

33.     The defendants identified in ¶¶26-27 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶26, 28-32 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶28-29, 31-32 are referred to herein as the "Audit Committee Defendants."  Collectively, the defendants identified in ¶¶26-32 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

34.     By reason of their positions as officers and directors of the Puma, each of the Individual Defendants owed and owe Puma and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Puma in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Puma and not in furtherance of their personal interest or benefit.

35.     To discharge their duties, the officers and directors of Puma were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Puma.  By virtue of such duties, the officers and directors of Puma were required to, among other things:

(a)     accurately guide the Company's stockholders and the public when speaking about Puma's business endeavors, including the results of the ExteNET trial of neratinib;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and refraining from engaging in deceptive or fraudulent conduct;

(c)     refrain from causing or allowing the Company to issue misleading proxy statements; and

       (d)     ensure processes were in place for maintaining the integrity and reputation of the Company and reinforcing a culture of ethics, compliance, and appropriate risk management.

**Breaches of Duties**

36.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Puma, the absence of good faith on their part, and a reckless disregard for their duties to the Puma that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Puma.

37.    The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, Puma to make improper statements to the public and the Company's stockholders, an unlawful practice that wasted Puma's assets and caused the Company to incur substantial damage. The Individual Defendants also breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, Puma to issue misleading proxy statements.

38.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of Puma, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. As a result, and in addition to the damage the Puma has already incurred, Puma has expended, and will continue to expend, significant sums of money.

**Additional Duties of the Audit Committee Defendants**

39.    In addition to these duties, pursuant to the Audit Committee Charters in effect from October 18, 2012 through January 3, 2017 (the "Charters"), the Audit Committee Defendants, defendants Malley, Moyes, Wilson, and Zavrl owed specific duties to Puma to discuss with Company management: (i) financial information provided to analysts; (ii) Puma's significant risk exposures; and (iii) management's efforts to address these exposures. The Charters also required the Audit Committee Defendants to report regularly to, and review

with the Board issues regarding Puma's legal and regulatory compliance.  The Charters provide:

>10.    The Committee shall discuss with management and the independent auditor the Company's earnings press releases (with particular focus on any "pro forma" or "adjusted" non-GAAP information), as well as financial information and earnings guidance provided to analysts and rating agencies.

* * *

>15.    The Committee shall discuss with management the Company's policies with respect to risk assessment and risk management. The Committee shall discuss with management the Company's significant financial risk exposures and the actions management has taken to limit, monitor or control such exposures.

* * *

>19.    The Committee, through its Chair, shall report regularly to, and review with, the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent auditor, the performance of the Company's internal audit function or any other matter the Committee determines is necessary or advisable to report to, or review with, the Board.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

40.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

41.    During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the

investing public, including stockholders of Puma, regarding the Individual Defendants' management of Puma's operations and neratinib's safety and efficacy; and (ii) negligently mislead Company investors through the 2015 Proxy and 2017 Proxy.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

42.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused Puma to issue improper financial statements.

43.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning Puma's operations, financial condition, and future business prospects.

44.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing Puma to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

45.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## FACTUAL BACKGROUND

46.     Puma is a biopharmaceutical company that seeks to acquire and develop drugs to treat certain forms of cancer.  Prior to neratinib's eventual approval in 2017, Puma had not

received FDA approval to sell any of its drugs in the marketplace or produced any revenue since its founding. As a result, the success of neratinib was vital to the Company's continued existence. In a January 22, 2015, Prospectus Supplement on Form 424B2 filed with the SEC, the Individual Defendants stated "[w]e are heavily dependent on the success of neratinib (oral), our lead drug candidate, which is still under clinical development…."

47.     In order for a drug developer to sell its drug product in the United States, the developer must first receive approval from the FDA. This is a long, arduous, and expensive process. It requires lengthy, expensive, and time-consuming tests and trials. The further a company proceeds through the testing process, the larger, longer, and more expensive the trials become.

48.     The first stage in the process is a Phase I trial in which a company tests a medication's safety, appropriate dosage, and side effects on a small group of patients. This is followed by a Phase II trial that uses a larger group of patients to test a drug's effectiveness and side effects. Phase III, normally the final phase in the approval process, uses the largest group of patients. Phase III clinical trials compare the medication to other commonly used treatments and provide further information on the medication's safety and efficacy. According to FDA guidelines and pharmaceutical standards, these trials usually take several years to complete to determine the long-term effects of a medication on patients.

49.     In April 2009, Wyeth initiated the Phase III clinical trial of neratinib, known as the ExteNET trial. In 2011, following Wyeth's merger with Pfizer, Pfizer agreed to license neratinib to Puma. As a result of this license agreement, Puma assumed sole responsibility over the development of neratinib, including the ExteNET trial.

50.     Wyeth and Pfizer, and ultimately Puma, intended to develop the drug to treat individuals who had HER2-positive breast cancers. HER2-positive breast cancers tend to grow and spread more quickly than other forms of breast cancer. Moreover, HER2-positive breast cancers are more likely to recur post-treatment than other forms of breast cancers. Most of the patients who have this type of cancer develop a resistance to the few drugs

currently approved by the FDA to treat it. Thus, neratinib was designed to address this unmet need and provide treatment to a population that had few other alternatives.

51.     ExteNET trial researchers enrolled 2,821 patients with HER2-positive breast cancers in the trial. All of the patients had previously undergone surgery and one year of treatment with Herceptin. After the Herceptin treatment, the patients were randomly assigned to either the neratinib group or the placebo group. The neratinib group patients were treated with neratinib for one year and the placebo group patients were given placebos for one year. Puma researchers observed the patients' progress for the two-year period after the patients were randomly assigned to their groups.

52.     To bolster its case for FDA approval and establish a positive reputation in the market, the Company needed to show that the DFS rate for the patients in the neratinib group was several points higher than the DFS rate for the patients in the placebo group. Moreover, Puma needed to show that the drug did not have severe side effects that would seriously outweigh the benefits of taking the drug.

53.     On July 17, 2014, Wong e-mailed defendant Auerbach and other Puma executives, attaching a document entitled "Neratinib Protocol 3144A2-3004-WW Top-Line Efficacy Analysis Part A (2 years +28 days)." The document showed that the ExteNET trial results for neratinib were abysmal. Specifically, the data showed that there was only a meager 2.3% DFS rate increase for patients in the neratinib group versus patients in the placebo group. The Kaplan-Meier curves for the ExteNET trial were virtually flat by the end of the two-year observation period. This essentially meant that there was almost no statistical difference in the DFS rates for the treated and placebo groups after a two-year period. Furthermore, the Kaplan-Meier curves for these groups had begun to narrow by the end of the two-year observation period, indicating that the absolute DFS rate difference between the neratinib and placebo groups was decreasing.

54.     The next day, July 18, 2014, defendant Auerbach and other Puma executives were faced with more discouraging news when Wong sent them a PowerPoint presentation via e-mail. The PowerPoint presentation, entitled "3004 Executive Summary of Safety

18JUL2014," demonstrated that a staggering 39.9% of patients in the neratinib group experienced grade 3 or 4 diarrhea.  Furthermore, because of this extreme side effect and other adverse events, the neratinib group patients discontinued the ExteNET trial at a very high rate.  Specifically, the discontinuation rate for neratinib group patients due to grade 3 or 4 diarrhea was 16.8%, and the overall dropout rate for neratinib group patients due to adverse events was 27.6%.

## THE INDIVIDUAL DEFENDANTS' IMPROPER STATEMENTS ABOUT NERATINIB'S INSUBSTANTIAL EFFICACY AND HARMFUL SIDE EFFECTS

55.    Instead of disclosing the disappointing results of the ExteNET trial to the public, the Individual Defendants repeatedly represented to Puma investors and the public that neratinib usage resulted in a 33% improvement in DFS.  They based this statistic on an alleged 4-5% absolute DFS rate increase in neratinib group patients compared to placebo group patients.  However, Wong's July 17, 2014 e-mail revealed that the true absolute DFS rate difference between these groups was half as much, or a mere 2.3%.  Moreover, defendant Auerbach made improper statements to investors and the public regarding the percentage of neratinib group patients who experienced severe diarrhea as a result of taking the drug, the percentage of neratinib group patients who discontinued the trial due to adverse events, and the trajectories of the Kaplan-Meier curves for the ExteNET trial.

56.    The Individual Defendants' improper statements regarding neratinib began on July 22, 2014, when the Company issued a press release touting supposedly positive results from the ExteNET trial.  Specifically, the press release contained the representation that "[t]he results of the [ExteNET] trial demonstrated that treatment with neratinib resulted in a 33% improvement in disease free survival versus placebo."  Additionally, the press release included defendant Auerbach's representation that the Individual Defendants were "very pleased with the results of the ExteNET trial."  The press release stated:

> The primary endpoint of the trial was disease free survival (DFS). ***The results of the trial demonstrated that treatment with neratinib resulted in a 33% improvement in disease free survival versus placebo***. The hazard ratio was

determined to be 0.67 which was statistically significant with a p-value of 0.0046. The secondary endpoint of the trial was disease free survival including ductal carcinoma in situ (DFS-DCIS). The results of the trial demonstrated that treatment with neratinib resulted in a 37% improvement in disease free survival including ductal carcinoma in situ versus placebo. The hazard ratio was determined to be 0.63 which was statistically significant with a p-value of 0.0009. Based on these results from the ExteNET study, Puma plans to file for regulatory approval of neratinib in the extended adjuvant setting in the first half of 2015.

\* \* \*

*"We are very pleased with the results of the ExteNET trial with neratinib.* This represents the first trial with a HER2 targeted agent that has shown a statistically significant benefit in the extended adjuvant setting, which we believe provides a meaningful point of differentiation for neratinib in the treatment of HER2 positive breast cancer," said Alan H. Auerbach, Chief Executive Officer and President.

57. Later that day, in a conference call with analysts and investors, defendant Auerbach repeated the claim that neratinib demonstrated a 33% improvement in DFS for patients who took the drug compared to the patients who took the placebo. He stated:

To get back to the ExteNET trial, with regard to the efficacy results from the ExteNET trial, the primary endpoint of the trial was disease-free survival. ***The results of the trial demonstrated that treatment with neratinib resulted in a 33% improvement in disease-free survival versus placebo.*** The hazard ratio was determined to be 0.67, which was statistically significant, with a p-value of 0.0046. As a reminder, the p-value that was required to hit statistical significance was a p-value of 0.025.

58.     Defendant Auerbach alleged that this statistic was based on a 4-5% absolute DFS rate difference between these groups.  His statement was in response to questions from an analyst with Citi Research who asked the following:

[Analyst]: Congrats on this fantastically and, in many ways, unexpected data. So I have a ton of questions. Maybe I'll just take two, if you don't mind. One is, give us a little bit of a sense, what was the DFS on the [placebo] arm, first. And then second, help us understand, what do you know about the safety profile?

[Defendant Auerbach]: Okay. So in terms of the DFS of the placebo arm of the trial, it was in line with other reported trials. So it's inline with the Herceptin adjuvant studies. And then in terms of the safety profile, we haven't yet fully validated the safety database….

[Analyst]: *You're thinking that, if I'm correct, the DFS is probably around mid to high 80s, around 86% or so in the [placebo] arm?*

[Defendant Auerbach]: *I would be comfortable with that number.*

[Analyst]: *And one would imagine you probably had to show around 90% or 91% [in the neratinib arm]? Is that reasonable?*

[Defendant Auerbach]: *Yes. I think you can do a 33% improvement in DFS and come up with that calculation, given the numbers we gave.*

59.     Later in the conference call, an analyst with Leerink Partners asked defendant Auerbach whether the Kaplan-Meier curves for the ExteNET trial were widening over time. This was an important question because the widening of these curves over time would indicate that the absolute DFS rate was increasing for the patients in the neratinib group relative to the patients in the placebo group.  Defendant Auerbach proudly stated that the curves were, in fact, separating and that the absolute DFS rate difference was increasing year after year.  He even compared the ExteNET trial data to results from other clinical tests (involving breast cancer patients who took Herceptin) which showed up to an 8% absolute DFS rate difference between drug-treated group patients and placebo group patients.  The exchange between defendant Auerbach and the analyst went as follows:

- 19 -

[Analyst]: Congratulations, Alan, and your team. So can you – *I assume you have seen the curves for the two arms*. Can you give us a sense as to whether the separation is widening over time? Or how would you describe the curve separation?

[Defendant Auerbach]: *Yes….*  Okay, so the [ExteNET] trial started in April of 2009, and this data cut is as of October 2013. So that's essentially the last patient was followed for 2 years. So from those numbers, you can see we have a lot of patients who have been in for much more than that 2-year cutoff. *If we look at the curves going out beyond that, it looks like the curves are continuing to separate*.

*And to give a little more detail on that, if you look at the curves in the Herceptin adjuvant trials – so the HERA study, the BCIRG study, et cetera – the absolute difference in disease-free survival increases as you go out year over year. So, for instance, in the BCIRG trial, the DFS difference was 6% at 2 years and 7% at 3 years, then 8% at 4 years….*

*We're seeing the same preliminary trend in the ExteNET trial, where the curves appear to be continuing to separate as you go out year over year, and the absolute DFS difference is increasing year over year as well.*

60.    Defendant Auerbach later made the false claim that the Individual Defendants had "not yet seen the safety results from the ExteNET trial."  He stated:

*From a safety perspective, the Company has not yet seen the safety results from the ExteNET trial for neratinib, as the data is still being validated*.

61.    Defendant Auerbach then represented that patient dropouts due to adverse events "should be somewhere in the 5% to 10% range."  He made this claim after stating, once more, that he had not seen the safety results for the ExteNET trial.  Defendant Auerbach made these statements to analysts in exchanges that went as follows:

[Analyst]: Thanks. And lastly, I think you probably do know the dropout rate from the trial. Could you remind us of that?

[Defendant Auerbach]: ***Dropout rate due to side effects?***

[Analyst]: Sure, or anything, if you have it.

[Defendant Auerbach]: ***I don't have that. I apologize. That's part of the stuff being validated, but we anticipate, typically in the neratinib studies – the legacy ones that were done before, when Pfizer was running it without any prophylaxis – it was usually in the 5% to 10% range was the dropout rate due to [adverse events]. So we'd anticipate it's in that same vein.***

\* \* \*

[Analyst]: I just wanted to clarify an earlier answer to a question. So you were asked about the dropout rate, and I think you wanted to defer to dropouts due to – discontinuations due to adverse events. But can you just mention, or maybe I missed it, how many patients actually completed the year of therapy? Or another way of saying it is how much missing data is there from the DFS analysis?

[Defendant Auerbach]: Yes, so ***in terms of patients who dropped out due to AEs, like I said, historically with neratinib, that should be somewhere in the 5% to 10% range***.

62.   In the day following the July 22, 2014 press release and conference call, the Individual Defendants' incorrect and improper statements about neratinib caused the Company's market capitalization to experience an astounding increase of over $5 billion.

63.   During a November 13, 2014 conference call with analysts and investors, defendant Auerbach repeated the improper claim that neratinib group ExteNET trial patients experienced a 33% improvement in DFS.  He stated:

Interestingly, this is not the first time that we have seen a reduction in the incidence of brain mets with neratinib. As investors know, a few months ago, we announced positive top line results from a trial of neratinib in extended adjuvant HER2 positive breast cancer also known as the ExteNET trial. ***The primary endpoint of this trial was disease free survival and neratinib demonstrated a 33% improvement in disease free survival.***

64.     On January 20, 2015, Puma filed a Preliminary Prospectus Settlement on Form 424B5 with the SEC wherein the Individual Defendants announced a follow on sale of one million shares of Puma common stock.  The Form 424B5 repeated the Individual Defendants' misleading representation that the neratinib treatment led to a 33% improvement in DSF during the ExteNET trial.  The Form 424B5 stated:

The primary endpoint of the [ExteNET] trial was disease free survival (DFS). ***The results of the trial demonstrated that treatment with neratinib resulted in a 33% improvement in disease free survival versus placebo.*** The hazard ratio was determined to be 0.67, which was statistically significant with a p-value of 0.0046. The secondary endpoint of the trial was disease free survival including ductal carcinoma in situ (DFS-DCIS). The results of the trial demonstrated that treatment with neratinib resulted in a 37% improvement in disease free survival including ductal carcinoma in situ versus placebo. The hazard ratio was determined to be 0.63, which was statistically significant with a p-value of 0.0009. We anticipate presenting and publishing the Phase III trial results in mid-2015 and intend to file for regulatory approval of neratinib in the extended adjuvant setting in the first quarter of 2016. We believe that the worldwide Herceptin adjuvant revenue in 2013 was approximately $4.3 billion.

65.     On January 22, 2015, Puma filed the Prospectus Supplement on Form 424B2 with the SEC.  This filing also announced the follow on sale of Puma common stock. Additionally, the Form 424B2 contained an improper statement that was identical to the improper statement included in the Company's Form 424B5 filing.

66.     During a February 12, 2015 conference call with analysts and investors, defendant Auerbach claimed that the ExteNET trial results show that use of neratinib led to a 33% improvement in DFS (based on a 4-5% absolute increase in DFS rate).  He stated:

So on slide here, you can see the ExteNET trial which is our HER2-positive extended adjuvant breast cancer trial. This was a randomized study of 2,800 patients where patients were randomized to either receive Neratinib for a year or

- 22 -

placebo for a year after the completion of Herceptin in the adjuvant setting. The primary endpoint of the trial was disease-free survival. ***And in July of last year, we announced that this trial hit its primary endpoint, showing a 33% improvement in disease-free survival*** the hazard ratio was 0.67 with a p-value of 0.0046.

67.     On March 2, 2015, Puma filed its 2014 Annual Report on Form 10-K with the SEC.  The Form 10-K was signed by defendants Auerbach, Eyler, Malley, Moyes, and Wilson and reported the Company's financial results for the 2014 fiscal year.  Moreover, in Puma's Form 10-K, the Individual Defendants repeated their claim that neratinib treatment led to a 33% improvement in DSF during the ExteNET trial.  The Form 10-K stated:

The primary endpoint of the trial was disease free survival (DFS). ***The results of the trial demonstrated that treatment with neratinib resulted in a 33% improvement in disease free survival versus placebo***. The hazard ratio was determined to be 0.67, which was statistically significant, with a p-value of 0.0046. The secondary endpoint of the trial was disease free survival including ductal carcinoma in situ (DFS-DCIS). The results of the trial demonstrated that treatment with neratinib resulted in a 37% improvement in disease free survival including ductal carcinoma in situ versus placebo. The hazard ratio was determined to be 0.63, which was statistically significant with a p-value of 0.0009. We anticipate presenting and publishing the Phase III trial results in mid-2015 and intend to file for regulatory approval of neratinib in the extended adjuvant setting in the first quarter of 2016.

68.     During a March 3, 2015 conference call with analysts and investors, defendant Auerbach claimed, once more, that taking neratinib led to a 33% improvement in DFS (based on a 4-5% absolute increase in DFS rate)  He stated:

***So we announced the results in July of 2014, where we announced that the trial hit the primary endpoint. So, 33% improvement in disease free survival***, so that's a hazard ratio of 0.67, p-value of 0.0046….

- 23 -

69.     Defendant Auerbach repeated this claim once more during a May 7, 2015 conference call with analysts and investors.  He stated:

*In July of last year, we announced the trial hit its primary endpoint. We saw a 33% improvement in invasive disease-free survival.* That's a hazard ratio of 0.67 with a p-value of 0.0046.

## THE TRUTH IS SLOWLY REVEALED

70.     The true clinical results from the ExteNET trial started to be revealed on May 13, 2015.  On this date, Puma released a summary report on ExteNET, entitled Abstract #508, on the ASCO website.  Abstract #508 revealed that two years after the ExteNET trial patients were randomly assigned to either the neratinib group or the placebo group, the DFS rate for neratinib group patients was 93.9% and the DFS rate for placebo group patients was 91.6%. In other words, there was only a *2.3%* difference in DFS rate between patients who had been given neratinib for a year and patients who had been given a placebo for a year.  This figure contrasted greatly with the Individual Defendants' repeated claim that there was a 33% DFS improvement in patients taking neratinib based on a *4-5%* absolute increase in DFS rate.  The Company's disclosure of Abstract #508 caused Puma to incur a one-day market capitalization loss of over $1.2 billion.

71.     On June 1, 2015, Dr. Arlene Chan, one of the authors of Abstract #508, disclosed additional results of the ExteNET trial at the annual ASCO meeting.  Her presentation confirmed there was only a 2.3% absolute DFS rate difference between the neratinib group and placebo group patients after two years of observation.  The presentation also revealed that there was a 2.2% absolute DFS rate difference between the neratinib and placebo group patients after the first year of observation and a 2.3% absolute DFS rate difference after the second year of observation.  This means that between the first and second years of observation, the absolute DFS rate difference between the neratinib group and placebo group only grew by a dismal 0.1%.

72.     Moreover, Dr. Chan's presentation revealed the Kaplan-Meier curves for the ExteNET trial for the first time.  The infographic containing the Kaplan-Meier curves showed

that the curves were basically flat by the end of the second year of observation.  This essentially meant that there was almost no statistical difference in DFS rates between the neratinib group and the placebo group after a two-year period.  In addition, although defendant Auerbach had previously claimed that the Kaplan-Meier curves were separating, the infographic showed that the curves had begun to narrow by the end of the two-year observation period.  The narrowing of these curves demonstrated that the absolute DFS rate difference between the neratinib group and placebo group patients was decreasing.  Dr. Chan's presentation displayed the Kaplan-Meier curves for the ExteNET trial as follows:



73.     During the July 22, 2014 conference call, defendant Auerbach compared the ExteNET trial Kaplan-Meier curve separation to the Kaplan-Meier curve separation in another clinical trial involving patients who had taken Herceptin (the "BCIRG trial").  In reality, the trajectories of the Kaplan-Meier curves for the BCIRG and ExteNET trials looked nothing alike.[6]   In particular, the Kaplan-Meier curves in the BCIRG trial showed a

---

[6] The BCIRG trial resulted in absolute DFS rate differences between Herceptin and placebo group patients of 6% following the second year of observation, 7% following the third year of observation, and 8% following the fourth year of observation.  Based on these results, the Kaplan-Meier curves for the BCIRG trial reflected a trend of significant separation over time.

continuing trend of significant separation over time.  However, the Kaplan-Meier curves for the ExteNET trial showed much less significant separation and actually began to narrow over time.

74.     Moreover, Dr. Chan's presentation further revealed that 16.8% of the neratinib group patients discontinued treatment because of the severe diarrhea they experienced from taking neratinib.  This fact invalidated defendant Auerbach's contention that only 5% to 10% of patients would drop out of the trial due to adverse events.  The Company suffered a two-day market capitalization loss of over $1.5 billion following Dr. Chan's disclosure of the ExteNET trial's dismal results.

### THE MISLEADING 2015 PROXY BY THE 2015 PROXY DEFENDANTS

75.     The section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the 2015 Proxy Defendants, defendants Auerbach, Malley, Moyes, and Wilson.  The section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

76.     The 2015 Proxy Defendants issued the 2015 Proxy on April 30, 2015.  The 2015 Proxy sought stockholder approval of various proposals, including a proposal to add an amendment to Puma's 2011 Incentive Award Plan.  The amendment would allow the 2015 Proxy Defendant to issue four million additional shares under the plan.  The 2015 Proxy claimed that stockholder approval of this proposal was "important to [the Company's] continued growth and success.  The 2015 Proxy stated:

---

The ExteNET trial resulted in much less significant absolute DFS differences between neratinib and placebo group patients of 2.2% following the first year of observation and 0.1% following the second year of observation.  Additionally, the Kaplan-Meier curves for the ExteNET trial began to converge after two years of observation.  For these reasons, the Kaplan-Meier curves for the BCIRG and ExteNET trials looked nothing alike.

We are asking our stockholders to approve the Amendment because we believe *the availability of an adequate reserve of shares under the Plan is important to our continued growth and success.*

77.    However, the 2015 Proxy misleadingly failed to disclose that the Company's alleged "continued growth and success" had been artificially inflated by the Individual Defendants' improper statements about the safety and efficacy of neratinib.  This truth regarding Puma's purported "continued growth and success" was material to Puma stockholders' ability to determine whether to approve the proposed amendment to the 2011 Incentive Award Plan.

78.    Additionally, in support of reelecting defendants Auerbach, Malley, Moyes, and Wilson to the Board, the 2015 Proxy claimed that the Board was engaged in active oversight of risks facing the Company and that the Board establishes policies and procedures designed to mitigate these risks.  The 2015 Proxy stated:

*Our Board is exclusively involved in the general oversight of risks that could affect our business.* Our Board satisfies this responsibility through reports by each committee chair regarding the committee's considerations and actions, as well as through regular reports directly from officers responsible for oversight of particular risks within our Company. *Further, our Board oversees risks through the establishment of policies and procedures that are designed to guide daily operations in a manner consistent with applicable laws, regulations and risks acceptable to our Company.*

79.    The 2015 Proxy also claimed that the Board's Audit Committee, comprised of defendants Malley, Moyes, and Wilson, reviewed Puma's risk assessment and risk management processes.  The 2015 Proxy stated:

*Audit Committee*

Our Audit Committee provides oversight over each of our accounting and financial reporting process, the audit of our consolidated financial statements and our internal control function. Among other matters, the Audit Committee

assists our Board in oversight of the independent registered public accounting firm qualifications, independence and performance; is responsible for the engagement, retention and compensation of the independent auditors; reviews the scope of the annual audit; reviews and discusses with management and the independent registered public accounting firm the results of the annual audit and the review of our quarterly consolidated financial statements, including the disclosures in our annual and quarterly reports filed with the SEC; *reviews our risk assessment and risk management processes*; establishes procedures for receiving, retaining and investigating complaints received by us regarding accounting, internal accounting controls or audit matters; approves audit and permissible non-audit services provided by our independent registered public accounting firm; and reviews and approves related person transactions under Item 404 of Regulation S-K.

80.     The 2015 Proxy Defendants' representations regarding the risk oversight, assessment, and management responsibilities of the Board and its Audit Committee were misleading.  The Board's failure to oversee, assess, and manage the risks associated with allowing the Individual Defendants to make improper statements about neratinib's safety and efficacy caused the Company to suffer a market capitalization loss of over $1 billion. Moreover, the Board's inadequate risk oversight, assessment, and management activities led Puma investors to file the Securities Class Action against the Company.

81.     The 2015 Proxy harmed Puma by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors.  As a result of the 2015 Proxy Defendants' misleading statements in the 2015 Proxy, Puma's stockholders voted to reelect defendants Auerbach, Malley, Moyes, and Wilson to Puma's Board.

82.     The proxy solicitation process in connection with the 2015 Proxy was an essential link in Puma stockholders' decision to approve the amendment to the 2011 Incentive Award Plan and reelect defendants Auerbach, Malley, Moyes, and Wilson to the Board.

## THE MISLEADING 2017 PROXY BY THE 2017 PROXY DEFENDANTS

83.     The section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the 2017 Proxy Defendants, defendants Auerbach, Moyes, Wilson, Senderowicz, and Zavrl.  The section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

84.     The 2017 Proxy Defendants caused Puma to issue the 2017 Proxy on April 28, 2017.  In support of reelecting defendants Auerbach, Moyes, Wilson, Senderowicz, and Zavrl to the Board, the 2017 Proxy claimed that the Board was engaged in active oversight of risks facing the Company and that the Board establishes policies and procedures designed to mitigate these risks.  The 2017 Proxy also claimed that the Board's Audit Committee, comprised of defendants Moyes, Wilson, and Zavrl reviewed the Company's risk assessment and risk management processes.  The 2017 Proxy Defendants made these representations using the same language the 2015 Proxy Defendants included in the 2015 Proxy.

85.     The 2017 Proxy misled Puma stockholders by claiming that the Board and its Audit Committee were actively engaged in carrying out their risk oversight, assessment, and management functions when: (i) the Board had not taken steps to address the risk oversight, assessment, and management failures that allowed the Individual Defendants to make improper statements about neratinib; and (2) many of the Board members who were responsible for these failures still served on the Board.  These Board members include defendants Auerbach, Moyes, and Wilson.  Similarly, defendant Eyler maintained his Senior Vice President and Treasurer positions at Puma despite his improper statements.

86.     The 2017 Proxy harmed Puma by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors.  As a result of the 2017 Proxy Defendants' misleading statements in the 2017 Proxy, Puma's stockholders voted to reelect defendants Auerbach, Moyes, Wilson, Senderowicz, and

Zavrl to Puma's Board.  The proxy solicitation process in connection with the 2017 Proxy was an essential link in Puma stockholders' decision to reelect defendants Auerbach, Moyes, Wilson, Senderowicz, and Zavrl the Board.

### THE SECURITIES CLASS ACTION

87.    On June 3, 2015, Puma stockholders filed the Securities Class Action against defendants Auerbach, Eyler, and Puma alleging that the defendants made the improper statements described herein.  U.S. District Court Judge Andrew J. Guilford denied the defendants' motion to dismiss the consolidated complaint on September 30, 2016.  Judge Guilford held that plaintiffs had stated a claim against these defendants.  In particular, he held that the plaintiffs had properly stated a claim for the improper statements regarding the absolute DFS differences between neratinib group and placebo group patients, and the neratinib group patients' alleged DFS rate improvement.  The order stated: "[the plaintiffs have] adequately and specifically alleged why each of these statements and several others could be false or at least misleading."

88.    The Securities Class Action plaintiffs filed their first amended complaint on June 6, 2017.  The first amended complaint was based on the same misconduct alleged in the consolidated complaint, but included additional information such as allegations regarding the e-mails Wong sent to defendant Auerbach and other Puma executives.  On July 25, 2017, Judge Guilford denied the defendants' motion to dismiss the first amended complaint.  According to Judge Guilford,  defendant Auerbach's claim that the dropout rate for the ExteNET trial would be 5-10% did not fall under the Private Securities Litigation Reform Act's ("PSLRA") safe harbor for forward looking statements.  The order stated:  "Defendants shouldn't benefit from safe harbor by simply saying they 'anticipated' success when, in fact, they had a reasonable belief that defeat was just around the corner."

89.    On December 8, 2017, Judge Guilford issued an order granting the plaintiffs' motion for class certification, finding that the plaintiffs had satisfied the requirements of Rule 23 of the Federal Rules of Civil Procedure.

90.     As a result of these rulings, there is a significant likelihood that the Individual Defendants' misconduct and false statements, alleged herein, will cause Puma to incur substantial liability.

## DAMAGES TO PUMA

91.     As a result of the Individual Defendants' improprieties, Puma disseminated improper, public statements concerning neratinib's safety and efficacy.  These improper statements have devastated Puma's credibility as reflected by Puma's over $7.5 billion, or 91%, market capitalization loss.

92.     Puma's performance issues also damaged its reputation within the business community and in the capital markets.  In addition to price, Puma's current and potential customers consider a company's ability to disclose accurate information to the public.  The Company requires a substantial amount of cash to complete the clinical development and commercialization of its product candidates.  Puma's ability to raise equity capital or debt on favorable terms in the future is now impaired.  In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to Puma.

93.     Further, as a direct and proximate result of the Individual Defendants' actions, Puma has expended, and will continue to expend, significant sums of money.   Such expenditures include, but are not limited to:

        (a)     costs incurred from defending and paying any settlement or judgment in the Securities Class Action for violations of federal securities laws; and

        (b)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to Puma.

## DERIVATIVE AND DEMAND ALLEGATIONS

94.     Plaintiff brings this action derivatively in the right and for the benefit of Puma to redress injuries suffered, and to be suffered, by Puma as a direct result of violation of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the

aiding and abetting thereof, by the Individual Defendants. Puma is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

95.   Plaintiff will adequately and fairly represent the interests of Puma in enforcing and prosecuting its rights.

96.   Plaintiff is currently a stockholder of Puma, became a stockholder while defendants were engaged in the wrongdoing described herein, and before any such wrongdoing became public, and has continuously been a stockholder since acquiring his stock.

97.   On August 29, 2017, plaintiff sent his Litigation Demand to the Board. The Litigation Demand outlined the improper statements detailed herein (the same statements that the Court in the Securities Class Action found sufficient to deny a motion to dismiss under the heighted standards of Federal Rule of Civil Procedure 9(b) and the PSLRA on September 30, 2016). The Litigation Demand also insisted that "independent and disinterested directors with the assistance of independent outside legal counsel" investigate this wrongdoing.

98.   Plaintiff further insisted that, following the investigation, "the Company commence legal proceedings against each party identified as being responsible for the mismanagement and other related misconduct" described in the Litigation Demand. Additionally, plaintiff demanded that the Board implement corporate governance policies to prevent the recurrence of these issues.

99.   Cheryl Collett ("Collett"), Puma's Vice President of Finance and Accounting, responded to the Litigation Demand in a letter dated September 13, 2017. Collett advised plaintiff's counsel that the Litigation Demand was being taken "under consideration" and that "the Board will respond to [plaintiff's counsel] once a decision has been made." The letter also "welcome[d]" plaintiff's counsel to provide "any evidence, information, or insights [he had] that might assist the Board in reaching a decision."

100.   After a month passed without any further response from the Board or Company representatives, plaintiff's counsel sent Collett a letter, dated October 23, 2017, requesting an

update on the status of the Board's consideration of the Litigation Demand. Plaintiff's counsel specified that this update was to include "whether the Board has formed an independent committee to consider [the Litigation Demand] and whether it has hired independent counsel." A true and correct copy of plaintiff's counsel's October 23, 2017 letter is attached hereto as Exhibit B.

101. Collett responded to plaintiff's counsel in a letter dated November 3, 2017. However, she did not provide a response to plaintiff's counsel's request for an update regarding the Board's consideration of the Litigation Demand or any details pertaining to the Board's efforts to form an independent committee or hire independent counsel. Collett merely informed plaintiff's counsel that the Board's investigation of plaintiff's Litigation Demand was ongoing. In addition, the letter stated that the Board "remain[ed] interested in any evidence, information, or insights [plaintiff's counsel had] that might assist the Board in reaching a decision."

102. In a letter dated December 11, 2017, plaintiff's counsel responded to Collett. The letter identified that Collett had not responded to plaintiff's counsel's request that the Board provide an update on the status of its consideration of the Litigation Demand, including whether the Board had formed an independent committee and hired independent counsel to assist the Board in considering the Litigation Demand. Plaintiff's counsel repeated his request for this status update. Moreover, in response to the Board's offer for plaintiff's counsel to provide insights that might assist the Board in coming to a decision, plaintiff's counsel demanded once more that the Board form an independent committee and hire independent counsel. A true and correct copy of plaintiff's counsel's December 11, 2017 letter is attached hereto as Exhibit C.

103. Finally, Michele Johnson of Latham & Watkins LLP ("Latham & Watkins"), counsel for Puma and defendants Auerbach and Eyler in the Securities Class Action, sent a letter to plaintiff's counsel on January 9, 2018. The letter stated that Puma's Board had "unanimously concluded that pursuing the [Litigation] Demand would not be in Puma's or its shareholders' best interests" (the "Demand Refusal"). The Demand Refusal revealed that the

Board primarily based its decision to reject the Litigation Demand on an investigation Latham & Watkins had previously conducted in order to establish a defense in the Securities Class Action.

104.   In particular, the Demand Refusal states that the Board rejected the Litigation Demand based on: (i) an investigation Latham & Watkins had previously conducted *to establish a defense against the claims raised in the Securities Class Action;* (ii) a summary of that investigation and discovery completed in the Securities Class Action *prepared by Latham & Watkins*; (iii) documents and deposition testimony pertaining to the issues raised in the Litigation Demand *provided by Latham & Watkins*; and (iv) a "comprehensive presentation" *given by Latham & Watkins*.  The Demand Refusal stated:

> *As a result of the pending shareholder class action, the Company, through its outside counsel, Latham & Watkins LLP, has already undertaken an extensive investigation regarding the issues and allegations presented in the [Litigation] Demand….*

> Given the similarity between the class action allegations and your Demand, and in light of the extensive investigation that Puma's outside counsel has already undertaken, *the Board requested that Latham & Watkins provide the Board with a detailed summary of the investigation and formal discovery efforts completed thus far, along with the key issues and findings resulting from that investigation. The Board also requested that [Latham & Watkins] provide the Board key documents and deposition testimony regarding the issues raised in the Demand. The Board carefully considered this detailed summary, along with the collection of key documents and deposition testimony in evaluating the merits of the Demand*.

> *Following a review of these materials, and a comprehensive presentation by [Latham & Watkins], the independent members of the Board concluded that it was not necessary to retain independent counsel to investigate the Demand. The independent board members also concluded, based on the evidence*

***collected and reviewed, that the Demand lacks merit and that pursuing any of***
***the matters requested in the Demand would waste corporate resources and***
***distract from the Company's mission.*** The independent members of the Board
have therefore unanimously concluded that pursuing the Demand would not be
in Puma's or its shareholders' best interests.

105.   The Board ignored plaintiff's demand that they hire independent counsel to investigate the misconduct described in the Litigation Demand.  Moreover, in determining not to pursue the Litigation Demand, the Board relied on an investigation Latham & Watkins had previously conducted to establish a defense against the claims raised in the Securities Class Action.  However, Latham & Watkins' investigation did not involve a neutral analysis of the claims presented in the Securities Class Action or the facts discovered during the investigation.  Rather, the investigation was conducted to obtain evidence exculpating the defendants in the Securities Class Action.  By relying on a biased investigation of the wrongdoing described in the Litigation Demand, rather than conducting an independent investigation, the Board failed to properly investigate this wrongdoing.

106.   The Board was aware that Latham & Watkins was advising them on issues pertaining to the Litigation Demand while representing the defendants in the Securities Class Action.

107.   Refusing plaintiff's Litigation Demand was wrongful, unreasonable, and not in the best interests of the Company.  Further, the Board's decision to ignore and refuse the Litigation Demand was not within the ambit of the business judgment rule.  Nor was the Board's decision to refuse the Litigation Demand the result of an independent process, as shown by its legal advisor being the same law firm that is representing the defendants in the Securities Class Action.

108.   As alleged herein, Puma has been exposed to hundreds of millions of dollars in liability due to, among other things, the Individual Defendants' improper statements about the safety and efficacy of neratinib.  The claims detailed in the Litigation Demand are well-founded, as evidenced by the fact that the Securities Class Action has survived a motion to

dismiss.  Despite this knowledge, the Board failed to conduct an independent, good faith investigation of these claims.

109.   For the foregoing reasons, the Board's rejection of plaintiff's Litigation Demand was wrongful and unreasonable.  Plaintiff believes the institution of this action is necessary to preserve the claims asserted herein for the benefit of the Company.

110.   Plaintiff has not made any demand on the other stockholders of Puma to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)   Puma is a publicly held company with over 37.5 million shares outstanding and thousands of stockholders;

(b)   making demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)   making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

### Against the 2015 and 2017 Proxy Defendants for
### Violation of Section 14(a) of the Exchange Act

111.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

112.   The section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the 2015 or 2017 Proxy Defendants.  The section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

113.   The 2015 Proxy Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which

were contained in the 2015 Proxy.  The 2015 Proxy contained a proposal to amend the 2011 Incentive Award Plan to allow the 2015 Proxy Defendants to issue four million additional shares under the plan.  These defendants claimed, in the 2015 Proxy, that the amendment was important to Puma's "continued growth and success."  However, the 2015 Proxy Defendants failed to disclose that at the time the 2015 Proxy was issued, Puma's alleged "continued growth and success" was artificially inflated by the Individual Defendants' misconduct and improper statements.  The 2015 Proxy misled Puma stockholders regarding the true nature of the Company's purported growth and success.

114.   Moreover, in support of reelecting themselves to the Board, the 2015 Proxy Defendants misled Puma stockholders, through the 2015 Proxy, by falsely representing that the Board and its Audit Committee were upholding their risk oversight, assessment, and management duties.  In reality, the Board was failing to oversee, assess, and manage the obvious financial and legal risks associated with the Individual Defendants' improper statements about neratinib's safety and efficacy.

115.   The 2017 Proxy Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2017 Proxy.  In support of reelecting themselves to the Board, the 2017 Proxy Defendants misled Puma stockholders, through the 2017 Proxy, by falsely representing that the Board and its Audit Committee were upholding their risk oversight, assessment, and management duties.  However, the 2017 Proxy Defendants had failed to take steps to prevent the Company from incurring further damage as a result of improper statements made by Puma directors and officers.  Additionally, many of the Individual Defendants who damaged the Company through their improper statements about neratinib's safety and efficacy remained on the Board.  Likewise, defendant Eyler remained a Company Senior Vice President and Treasurer despite his improper statements about neratinib.

116.   By reasons of the conduct alleged herein, the 2015 and 2017 Proxy Defendants violated section 14(a) of the Exchange Act.  As a direct and proximate result of the 2015 Proxy Defendants' wrongful conduct, Puma misled and/or deceived its stockholders by

making misleading statements that were an essential link in stockholders heeding Puma's recommendations to authorize millions of additional shares to be issued under the 2011 Incentive Award Plan and reelect the 2015 Proxy Defendants to the Board.

117.   The misleading information contained in the 2015 Proxy was material to Puma's stockholders in determining whether to approve the proposals to authorize millions of additional shares to be issued under the 2011 Incentive Award Plan and reelect the 2015 Proxy Defendants to the Board.  The proxy solicitation process in connection with the 2015 Proxy was an essential link in the approval of these proposals.

118.   Plaintiff, on behalf of Puma, thereby seeks relief for damages inflicted upon the Company based upon the misleading 2015 Proxy in connection with the improper approvals of the proposals to authorize millions of additional shares to be issued under the 2011 Incentive Award Plan and reelect the 2015 Proxy Defendants to the Board.

119.   As a direct and proximate result of the 2017 Proxy Defendants' wrongful conduct, Puma misled and/or deceived its stockholders by making misleading statements that were an essential link in stockholders heeding Puma's recommendation to reelect the 2017 Proxy Defendants to the Board.

120.   The misleading information contained in the 2017 Proxy was material to Puma's stockholders in determining whether to approve the proposal to reelect the 2017 Proxy Defendants to the Board.  The proxy solicitation process in connection with the 2017 Proxy was an essential link in the approval of these proposals.

121.   Plaintiff, on behalf of Puma, thereby seeks relief for damages inflicted upon the Company based upon the misleading 2017 Proxy in connection with the improper approvals of the proposal to reelect the 2017 Proxy Defendants to the Board.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

122.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

123.   The Individual Defendants owed and owe Puma fiduciary obligations.   By reason of their fiduciary relationships, the Individual Defendants owed and owe Puma the highest obligation of good faith, fair dealing, loyalty, and due care.

124.   The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.   More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within Puma, and/or consciously failing to prevent Puma from engaging in the unlawful acts complained of herein.

125.   The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.   The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing that the Individual Defendants' statements regarding neratinib's safety and efficacy and the reasons for which the Securities Class Action was filed were improper.   Accordingly, the Officer Defendants breached their duties of care and loyalty to Puma.

126.   The Director Defendants as directors of Puma, owed Puma the highest duty of loyalty.   These defendants breached their duties of loyalty by recklessly permitting the improper activity concerning the Individual Defendants' statements about neratinib's clinical trial results.   These defendants knew or were reckless in not knowing that the Individual Defendants' statements regarding neratinib's safety and efficacy were improper.   Accordingly, the Director Defendants breached their duties of loyalty to the Company.

127.   The 2015 Proxy Defendants failed to uphold their risk oversight duties by preventing the improper activity concerning the Individual Defendants' statements about neratinib's clinical trial results.   This failure constitutes a breach of their duties of loyalty to Puma.

128.   The 2017 Proxy Defendants failed to uphold their risk oversight duties by taking steps to prevent Puma employees and directors from further damaging the Company through improper statements.   Accordingly, these defendants breached their duties of loyalty to the Company.

129.   The Audit Committee Defendants breached their fiduciary duties of loyalty by failing to uphold their duties to discuss the financial information defendant Auerbach would be providing to analysts with Puma's management and independent auditor.  The Individual Defendants represented that the Company was "heavily dependent on the success of neratinib."  The accuracy of this statement is reflected in the significant market capitalization damage Puma incurred when investors and the public became aware of the drug's insubstantial efficacy and harmful side effects.  For this reason, the results of the ExteNET trial of neratinib constitute "financial information" under the Audit Committee Charters in effect while defendant Auerbach was providing analysts with misleading information about the results of the trial.

130.   Accordingly, the Audit Committee Defendants breached their duties of loyalty to Puma by knowingly or recklessly failing to discuss the ExteNET trial results defendant Auerbach would be presenting to analysts with Puma's management and independent auditor. They also breached their duty of loyalty to the Company by knowingly or recklessly allowing defendant Auerbach to provide analysts with misleading information about the ExteNET trial results.

131.   The Audit Committee Defendants further breached their duties of loyalty to Puma by failing to discuss with Puma's management the Company's significant financial exposures and management's efforts to address those exposures.  Specifically, the Audit Committee Defendants knowingly or recklessly failed to discuss with Puma's management the significant financial exposure posed by the Individual Defendants' improper statements about neratinib's safety and efficacy.  These improper statements caused Puma to incur substantial damages including the cost of defending against a Securities Class Action and the cost necessary to settle or pay a judgment as a result of the lawsuit.  Moreover, the Audit Committee Defendants knowingly or recklessly failed to discuss, with the Company's management, efforts taken by management to address these issues.  This failure is evidenced by the fact that the Individual Defendants continued to make improper statements regarding

neratinib's safety and efficacy for ten months until Puma investors and the public learned the truth about the drug's deficiencies.

132.   The Audit Committee Defendants further breached their duties of loyalty to Puma by failing to uphold their duties to report regularly to, and review with the Board issues regarding Puma's legal and regulatory compliance.  In particular, these defendants knowingly or recklessly failed to report to, and review with the Board the Individual Defendants' failure to comply with legal and regulatory requirements by making improper statements about neratinib's safety and efficacy.

133.   In addition, the Audit Committee Defendants breached their duties of loyalty to the Company by failing to uphold their duties to report regularly to, and review with the Board issues regarding Puma's legal and regulatory compliance.   Specifically, these defendants knowingly or recklessly failed to report to, and review with the Board policies and procedures designed to prevent Puma from sustaining additional damage as a result of improper statements made by Company directors and executives.

134.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Puma has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to Puma.

135.   Plaintiff, on behalf of Puma, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Waste of Corporate Assets

136.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

137.   By making improper statements about the safety and efficacy of neratinib, the Individual Defendants have caused the Company to incur the substantial cost of defending against the Securities Class Action and paying any settlement reached or judgment awarded as a result of this lawsuit.  No business person of ordinary and sound judgment could conclude that this use of corporate assets resulted in adequate consideration for the Company.

138.   As a result of the waste of corporate assets, the Individual Defendants are liable to Puma.

139.   Plaintiff, on behalf of Puma, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

140.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

141.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Puma.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Puma.

142.   Plaintiff, as a stockholder and representative of Puma, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

143.   Plaintiff, on behalf of Puma, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Puma, demands judgment as follows:

A.   Against all of the defendants and in favor of Puma for the amount of damages sustained by Puma as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.   Directing Puma to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Puma and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to Puma's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following Corporate Governance Policies:

      1.   a proposal to strengthen Puma's oversight of its disclosure procedures;

2.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

3.    a provision to permit the stockholders of Puma to nominate at least three candidates for election to the Board;

C.    Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Puma has an effective remedy;

D.    Awarding to Puma restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.    Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: February 9, 2018

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
KEVIN A. SEELY
ASHLEY R. RIFKIN
STEVEN M. MCKANY

/s/ *Brian J. Robbins*
BRIAN J. ROBBINS

600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsarroyo.com
        kseely@robbinsarroyo.com
        arifkin@robbinsarroyo.com
        smckany@robbinsarroyo.com

Attorneys for Plaintiff

## VERIFICATION

I, Arnaud van der Gracht de Rommerswael, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Verified Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: Feb 5 2018

ARNAUD VAN DER GRACHT DE ROMMERSWAEL