ROBBINS ARROYO LLP
BRIAN J. ROBBINS (190264)
brobbins@robbinsarroyo.com
KEVIN A SEELY (199982)
kseely@robbinsarroyo.com
ASHLEY R. RIFKIN (246602)
arifkin@robbinsarroyo.com
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARNAUD VAN DER GRACHT DE ROMMERSWAEL, Derivatively on Behalf of PUMA BIOTECHNOLOGY, INC., | Case No. 8:18-cv-00236-AG-JCG |
| Plaintiff, | DECLARATION OF ASHLEY R. RIFKIN IN SUPPORT OF PLAINTIFF'S MOTION FOR FINAL APPROVAL OF DERIVATIVE SETTLEMENT |
| v. | |
| ALAN H. AUERBACH, CHARLES R. EYLER, JAY M. MOYES, TROY E. WILSON, ADRIAN M. SENDEROWICZ, FRANK E. ZAVRL, and THOMAS R. MALLEY, | |
| Defendants, | |
| -and- | |
| PUMA BIOTECHNOLOGY, INC., a Delaware corporation, | Date: January 7, 2019 |
| Nominal Defendant. | Time: 10:00 a.m. Courtroom: 10D Judge: Hon. Andrew J. Guilford |

I, Ashley R. Rifkin, declare:

1.     I am an attorney duly licensed to practice before all of the courts of the State of California.  I am a partner with the law firm Robbins Arroyo LLP ("Robbins Arroyo" or the "Firm"), counsel for plaintiff Arnaud Van Der Gracht de Rommerswael ("Plaintiff") in the above-captioned consolidated action (the "Action").  Robbins Arroyo's Firm Resume is attached hereto as Exhibit A.

2.     I submit this Declaration in Support of Plaintiff' Motion for Final Approval of Derivative Settlement ("Motion"), which is being filed contemporaneously herewith.[1]   The facts submitted herein demonstrate that the Settlement is fair, reasonable, and adequate, and in the best interests of Puma Biotechnology, Inc. ("Puma" or the "Company") and its shareholders, and the agreed-to amount of fees and expenses is reasonable and appropriate.

## I.    INTRODUCTION

3.     The Settlement represents an outstanding resolution for Puma, and is the product of vigorous, arm's-length negotiations among the Settling Parties, with mediator Gregory P. Lindstrom ("Mediator") assisting the Parties in reaching the agreed-upon Fee and Expense Amount.  The Settlement provides for numerous, significant corporate governance enhancements that directly address the alleged wrongdoing to ensure that misstatements regarding the Company's research and development efforts and risks are unlikely to occur again.

4.     Among other things, the Reforms include: (i) appointment of one new Independent Director to the Board; (ii) Stockholder input for the new Independent Director and future director nominees; (iii) requirement that the Nominating and

---

[1] Unless otherwise noted, all capitalized terms shall have the same definitions as set forth in the Stipulation of Settlement dated September 28, 2018 ("Stipulation" or "Stip") (ECF No. 17-1), and filed as Exhibit 1 to the Joint Status Report and Notice of Filing Stipulation of Settlement (ECF No. 17).

Corporate Governance Committee meet with each director nominee; (iv) requirement that two-thirds of the directors must satisfy heightened independence standards; (v) creation of a Board-level Research and Development Committee ("R&D Committee") to oversee product pipeline and research and development efforts (including those regarding clinical trials) and to review and preapprove material public disclosures; (vi) director stock ownership requirements; (vii) annual assessments of Puma's financial reporting and disclosures by management and the Audit Committee; (viii) requirement that the Audit Committee inform the Board of any material suspected errors in the books and report to the Board if Puma appears to have insufficient liquidity; (ix) limitation on director engagements outside of the Company; (x) requirement that the Compensation Committee consider officers' performance as it relates to legal compliance and compliance with the Company's internal policies and procedures in determining the compensation and termination benefits of officers; and (xi) heightened requirements for approval and disclosure of related party transactions.  These policies, among others, address weaknesses in Puma's disclosure controls by requiring independent Board oversight over the Company's research and development efforts and related public disclosures and generally improve and strengthen the Company's internal controls.  These Reforms are especially valuable to Puma and its shareholders given the current stage of the Company's product pipeline, as the Reforms will restore investor confidence in the Company as it undergoes ongoing clinical trials of its drug, neratinib, and seeks approval of neratinib in several countries abroad.  As detailed herein, these substantial benefits conferred on Puma support final approval of the Settlement.

5.      After negotiating the material terms of the Settlement, the Settling Parties, with the assistance of the Mediator, negotiated the amount of attorneys' fees and expenses to be paid to Plaintiffs' Counsel.  As a result of those negotiations, Puma has agreed to cause its insurers to pay Plaintiffs' Counsel $1,175,000 in

recognition of the substantial benefits conferred upon the Company. This Fee and Expense Amount has been approved by Puma's independent, non-defendant directors in a good faith exercise of business judgment. Stip., §IV.

6.  In sum, the Settlement confers substantial benefits upon Puma, is fair, reasonable, and adequate, and should be approved in its entirety.

## II.  BACKGROUND OF THE LITIGATION

7.  This litigation relates to a series of disclosures regarding the results of the Company's clinical trials for its new drug, neratinib, which Plaintiffs allege were misleading. Plaintiffs further allege that when Puma presented the full details of the clinical trial results regarding the drug's safety and efficacy, Puma's market capitalization fell by over $7.5 billion, or 91%.

8.  As a result, on June 3, 2015, Puma investors filed a securities class action in this Court, entitled *Hsu v. Puma Biotechnology, Inc.*, No. 8:15-cv-00865-AG-SHK (the "Securities Action"), seeking to recover their losses. Stip., §I.A. Trial in the Securities Action is scheduled to begin January 15, 2019.

### A.  Proceedings in This Derivative Action

9.  On August 29, 2017, after significant analysis and investigation into the alleged wrongdoing, including investigation into whether the Puma Board was sufficiently independent to consider a litigation demand, Plaintiff sent a litigation demand letter to the Board demanding that it engage independent outside legal counsel, investigate the misconduct, and take legal action against the individuals responsible ("Litigation Demand"). Stip., §I.C. The Litigation Demand was rejected by the Board through a letter dated January 9, 2018. *Id.*

10.  On February 9, 2018, Plaintiff filed his stockholder derivative action, alleging that the Litigation Demand was wrongfully refused. *Id.* Plaintiff alleges that the Board failed to perform a good faith, independent investigation of the claims contained in the Litigation Demand, but instead based its decision to reject the

Litigation Demand on a biased investigation previously conducted by counsel for Puma to develop a defense in the Securities Action. *Id.*

### B.  Proceedings in Related Derivative Actions

11.   In April 2016, plaintiffs Xing Xie ("Xie") and Kevin McKenney ("McKenney"), also after significant analysis and investigation, each filed stockholder derivative actions regarding the alleged wrongdoing in the Los Angeles Superior Court (the "Superior Court"), which the Superior Court later consolidated (the "State Actions"). *Id.*, §I.B.  The State Actions allege that making a demand on the Puma Board to investigate the misconduct and take legal action against the individuals responsible was excused as futile. *Id.*  The State Actions have been stayed since June 21, 2016, pending resolution of the Securities Action. *Id.* Pursuant to the terms that were negotiated in the stipulation to stay that was granted by the Superior Court, Defendants provided counsel for the plaintiffs in the State Actions with several hundred thousand pages of documents that were produced in connection with the Securities Action. *Id.*

12.   On May 30, 2018, plaintiff Paul Duran ("Duran"), also after significant analysis and investigation, filed a stockholder derivative action in this Court, alleging the same wrongdoing and that demand on the Puma Board to investigate the misconduct and take legal action against the individuals responsible was excused as futile. *Id.*, §I.C.

### C.  Settlement Efforts and Confirmatory Discovery

13.   Given the unique circumstances of this case, including recent, positive developments at Puma as it gained momentum toward commercially launching its drug, neratinib, in the United States and abroad, counsel for Plaintiffs believed that an early resolution of the derivative claims could be in Puma's best interests. *Id.*, §I.D.  As such, counsel for the plaintiffs in the State Actions and counsel for Plaintiff

1  in this Action sent separate settlement demands on February 23, 2018, and April 5,
2  2018, respectively.  *Id.*

3      14.    Over the next few months, counsel engaged in numerous telephonic and
4  written exchanges regarding the terms to be included in any settlement, with a
5  careful eye toward ensuring the settlement included comprehensive corporate
6  governance reforms tailored to preventing the alleged wrongdoing from recurring.
7  *Id.*   On or about June 29, 2018, the Parties agreed upon the Reforms to be
8  implemented as part of the Settlement.  *Id.* & Ex. A.

9      15.    After agreeing upon the substantive consideration for the Settlement, the
10 Settling Parties turned to the question of Plaintiffs' Counsel's fees and expenses.  *Id.*,
11 §I.D.  After submitting briefs to the Mediator regarding an appropriate fee in light of
12 the substantial benefits secured by Plaintiffs' Counsel, the Settling Parties and a
13 Puma D&O liability insurer engaged in a day-long mediation on July 25, 2018.  *Id.*
14 The Settling Parties were unable to resolve the matter at the mediation, but continued
15 to work with the Mediator telephonically, and reached an agreement in principle on
16 July 30, 2018.  *Id.*  Puma's insurers have agreed to pay the Fee and Expense Amount
17 of $1,175,000, upon Court approval.  *Id.*, ¶4.1.

18     16.    The Settling Parties then prepared and negotiated the terms of the
19 Stipulation, which was executed on September 28, 2018.

20     17.    In the meantime, Puma provided Plaintiff with certain confirmatory
21 discovery, which consisted of over 1.2 million pages of documents produced in
22 connection with the related Securities Action.  Plaintiff performed a tailored review
23 of the confirmatory discovery through targeted searches.   Among other things,
24 Plaintiff reviewed emails among the Defendants regarding the results of the
25 Company's clinical trials, Board and committee meeting minutes, presentations
26 provided to the Board on the status and results of the Company's clinical trials, and
27 other clinical trial materials.  Through this review, the undersigned counsel for

28

- 5 -

Plaintiff confirmed their conclusion that the Settlement is fair, reasonable, and adequate, and in the best interests of Puma.

### D.   Preliminary Approval Granted and Notice to Stockholders

18.   On November 5, 2018, the Court granted preliminary approval of the Settlement, authorized the dissemination of the Notice and Summary Notice to Puma stockholders, and set the Settlement Hearing for January 7, 2019.  [In Chambers] Order Granting Motion for Preliminary Approval of Class Action Settlement (ECF No. 23) ("Prelim. Order") at 7.  As of the date of this filing, no objections have been received.

## III.   THE SETTLEMENT SHOULD BE FINALLY APPROVED

### A.   The Settlement Confers a Substantial Benefit upon Puma

19.   The Settlement guarantees Puma and its shareholders the substantial, immediate, and lasting benefits of enhanced governance reforms that directly address the alleged wrongdoing.

20.   The Reforms, which Puma has agreed to keep in place for at least five years, include, among other things:

21.   **Appointment of One New Independent Director:** Plaintiffs believe a critical and immensely valuable component of the Settlement is increasing the independence of Puma's six-member Board.  Increasing Board independence from management at Puma is crucial since Puma's founder, CEO, and President, defendant Auerbach, continues to serve as Chairman of the Board.

22.   As a result of the Settlement, Puma will appoint one new Independent Director, bringing the Board to seven members.  Stip., Ex. A, §I.A.  The Settlement also provides for stockholder input for the new Independent Director and future director nominees, as well as a requirement that the Nominating and Governance Committee meet with each prospective new Board member prior to his or her nomination and include their deliberations with respect to director nominees in the

- 6 -

minutes of their proceedings.  *Id.*  As this Court recognized, "the appointment of a new Independent Director will help ensure that the Board is not controlled by insiders with separate interests from those of Puma stockholders."  Prelim. Order at 5.  The additional Independent Director will provide a fresh, independent perspective on the Board and ensure that Puma insiders are held accountable to independent directors.  And the enhancements related to future director nominees will help ensure the Board remains independent going forward.

23.  **Director Independence:** To ensure that Puma's Board continues to be independent from management, the Settlement also requires Puma to maintain a Board comprised of at least two-thirds independent directors (as opposed to the current majority), who satisfy a list of heightened independence requirements beyond those set forth in the NASDAQ listing standards and the Sarbanes-Oxley Act.  Stip., Ex. A, §I.B.1-2.

24.  **Director Stock Ownership:** The Settlement requires all Puma nonemployee directors to attain beneficial ownership of not less than 10,000 shares of the Company's common stock within three years and to retain such minimum beneficial stock ownership so long as he or she continues to serve as a director.  Stip., Ex. A, §I.B.6.  This will help to ensure that Puma's directors share a financial interest with Puma's stockholders and put Puma's stockholders' interests first.  *See* Prelim. Order at 5 (recognizing that this new stock ownership requirement "will better align the directors' and stockholders' interests").

25.  **Director Training:** The Settlement requires Puma to implement a formal continuing education program requiring that each director attend: (a) at least once every three years (or within six months of joining the Board for new directors) one multi-day training course provided by a nationally recognized corporate director education provider; and (b) at least annually an internal presentation on a topic of particular importance to the Company or the Board, including coverage of

compliance with generally accepted accounting principles, the Sarbanes Oxley Act, regulatory requirements for New Drug Application submissions, corporate governance, assessment of risk, compliance auditing, and reporting requirements for publicly traded companies. Stip., Ex. A, §I.B.3. These reforms will ensure that all directors are knowledgeable about their fiduciary duties, and adequately trained on topics that are of significant importance to Puma and its stockholders.

26.   **Limitation on Director Engagements and Committee Chairs:** The Settlement prohibits any individual member of the Board from being the chairman of more than one committee of the Board at a time, and it requires directors to seek approval from the Board in advance of accepting an invitation to serve on the board of another public company.   Stip., Ex. A, §I.B.5. These reforms will ensure that members of the Board have sufficient time and resources to effectively perform their duties, including monitoring management.

27.   **New R&D Committee:** In addition to increasing the independence of the Board, Plaintiffs also believe it was essential to improve the Board's engagement, access to information, and competence in overseeing Puma's product pipeline, clinical development risks, and related disclosures. Indeed, one of Plaintiffs' primary concerns was that the Board allowed management to make false and misleading disclosures regarding its clinical developments risks related to neratinib.

28.   As a result of the Settlement, Puma will create a new Board-level R&D Committee for the purpose of overseeing the Company's product pipeline and research and development efforts, including oversight and evaluation of the Company's clinical trials and clinical development risk. Stip., Ex. A, §I.H. The R&D Committee will be composed of three independent directors, a majority of whom have sufficient scientific and/or medical expertise to review and evaluate the progress of the Company's product pipeline. Id., §I.H.1. The R&D Committee will be responsible for, among other things: (a) meeting with the Chief Medical and

- 8 -

Scientific Officer at least quarterly to review the progress of the Company's product pipeline; (b) assessing each product's progress against its targets; (c) preapproving the Company's material public disclosures related to its product pipeline, research and development efforts, results of preclinical studies and clinical trials, status of New Drug Applications, and communications with the FDA; and (d) presenting to the entire Board at least quarterly on all significant findings concerning the progress of the Company's product pipeline. Id., §I.H.2-4.

29.     Thus, the Settlement provides the Board with the information, mandate, and resources necessary to prevent recurrence of the alleged wrongdoing and to deter related misconduct. *See* Prelim. Order at 5 ("the creation of an R & D Committee will provide crucial oversight of Puma's clinical trials and development risks and is designed to avoid exactly the sort of problems that led to the current litigation.").

30.     **Annual Assessment of Internal Controls:** The Settlement requires Puma management to work with the Audit Committee and R&D Committee to annually assess the adequacy of the Company's internal controls over financial reporting and disclosure controls and procedures and report in the Company's Form 10-K any material weaknesses. Stip., Ex. A, §I.G. In addition, the CFO must annually certify to the Audit Committee that the CFO and/or the Company's outside auditor has assessed the Company's financial reporting risks and addressed any potentially unlawful activities. *Id*., §I.E.2. Moreover, the Audit Committee must inform the full Board of any material suspected errors in the work of the independent audit, or in the Company's maintenance of accounting records, and must inform the full Board if it finds that the Company has insufficient liquidity to operate its business successfully. *Id.* These reforms are designed to further strengthen the oversight function of the Board and management by ensuring Puma's CFO, management, and directors are all held responsible for reviewing the Company's internal controls, and ensure they remain best practices.

31.     **Compensation Committee:** The Settlement requires the Compensation Committee to take into account a particular executive's performance as it relates to both legal compliance and compliance with the Company's internal policies when determining, setting, or approving his or her annual short-term compensation, termination benefits, and/or separation pay.   Stip., Ex. A, §I.D.   Aligning compensation with compliance will create financial incentives for management to abide by the law and the Company's internal policies.

32.     **Whistleblower Program:** The Settlement requires Puma to adopt reforms that will help ensure any complaints made through the Company's whistleblower hotline are appropriately escalated to management and the Board. Stip., Ex. A, §I.L.  The Code of Ethics will clarify that whistleblower provisions are meant for reporting potential violations of law and/or the Company policies.  A log of all whistleblower complaints, and the results of all investigations of complaints, shall be maintained for at least ten years, and presented to the Company's external auditor at least annually.  *Id.*  In addition, at each regularly-scheduled Board meeting, the Board shall be provided with a summary of the types of complaints received, as well as any material information resulting from any internal investigation into such complaints.  *Id.*  These reporting requirements will help ensure that any potential compliance violations and other material issues are timely brought before the Board and addressed.

33.     The above Reforms, among several additional enhancements obtained through the Settlement, are extensive and will provide substantial benefits to Puma for years after the Settlement is approved.[2]

_____

[2] The five year commitment term offers an effective safeguard against dilution or discontinuance of these Reforms going forward, thereby ensuring the reasonable opportunity for strong corporate governance policies and procedures to become embedded into Puma's corporate governance culture and practices.

DECLARATION OF ASHLEY R. RIFKIN ISO PS' MOTION FOR FINAL APPROVAL OF SETTLEMENT
Case No. 8:18-cv-00236-AG-JCG

**B.     The Risks of Establishing Liability and Damages**

34.     There is no question that derivative actions are complex and fraught with risk.  Indeed, the Ninth Circuit, in affirming the district court's approval of a settlement in a derivative action, noted that "the odds of winning [a] derivative lawsuit [are] extremely small" because "derivative lawsuits are rarely successful." *In re Pac. Enters. Sec. Litig*., 47 F.3d 373, 378 (9th Cir. 1995).  This case was no different.

35.     Plaintiffs believe that the claims asserted in the Actions were meritorious, but liability was by no means assured.   Had Plaintiffs continued to litigate, they would have faced serious legal hurdles just to survive past the pleading stage.   Plaintiffs would have to satisfy the stringent pleading standards for demonstrating that Plaintiff's presuit demand was wrongfully refused by the Board (in this Action), or that making a presuit demand was excused as futile (in the factually-related State Actions and Duran Action).

36.     If Plaintiffs' successfully overcame Defendants' dismissal motions, litigation would continue to be complex, with serious risks in overcoming potential defenses and in establishing liability.   At the conclusion of discovery and expert reports, complex motions for summary judgment would need to be briefed and argued and a trial would have to be held.

37.     Even if Plaintiffs were successful in defeating Defendants' dispositive motions, and ultimately established liability at trial, Plaintiffs still faced challenges establishing and collecting monetary damages.   Because Puma's Certificate of Incorporation contains an exculpatory clause, Plaintiffs may have ultimately proved their claims, only to see Individual Defendants exculpated with respect to payment of monetary damages. *See, e.g.*, *Prod. Res. Grp., L.L.C. v. NCT Grp., Inc*., 863 A.2d 772, 799 (Del. Ch. 2004).  And the possibility that some or all of Plaintiffs' claims

1  could have been characterized as "due care" claims could have meant those claims

2  were subject to dismissal well ahead of a trial.

3      38.    Faced with the risk of no recovery, the Settlement guarantees an

4  outstanding result for Puma with the implementation of valuable corporate

5  governance reforms that could not have been obtained if the Actions had proceeded

6  to trial.

7      39.    Accordingly, the Settlement is likely the best possible result and

8  provides a substantial benefit to the Company that may not have been achieved

9  through a trial and resulting appeals.

10     **C.    The Complexity, Expense, and Likely Duration of Continued Litigation Supports Approval of the Settlement**

11

12     40.    Another factor militating in favor of the Settlement is the complexity,

13  expense, and likely duration of the litigation.   Shareholder derivative actions are

14  notoriously complicated actions that involve complex legal and factual issues that

15  can be litigated to a conclusion on the merits only at great expense over an extended

16  period of time.  *Pac. Enters.*, 47 F.3d at 378 ("[T]he odds of winning the derivative

17  lawsuit were extremely small…  Even if it had gone to trial, derivative lawsuits are

18  rarely successful."); *see also In re OSI Sys., Inc. Derivative Litig.*, No. CV-14-2910-

19  MWF (MRWx), 2017 WL 5642304, at *3 (C.D. Cal. May 2, 2017) ("derivative

20  lawsuits are difficult to win under any circumstances").  The Actions would not have

21  been an exception to this rule.

22     41.    If not for this Settlement, the Actions would have been fiercely

23  contested by the Parties.  And continued litigation would be complex, costly, and of

24  substantial duration.  Document discovery would need to be completed, depositions

25  would have to be taken, experts would need to be designated and expert discovery

26  conducted, Defendants' anticipated motions dismiss and subsequent motions for

27  summary judgment would have to be briefed and argued, and a trial could occupy

28

- 12 -

1    attorneys on both sides and the Court for weeks or months.  Moreover, any judgment

2    favorable to Plaintiffs would likely be the subject of post-trial motions and appeals,

3    which would prolong the case for years with the ultimate outcome uncertain.

4        42.    The Settlement obviates this expenditure of further time and expenses,

5    and favorably resolves the Actions in the best interests of Puma, permitting the

6    Company to direct its full attention to business, including its ongoing clinical trials

7    and new drug applications abroad.    Thus, the prospect of continued protracted

8    expensive and uncertain litigation strongly supports approval of the Settlement,

9    which provides immediate and substantial benefits to Puma and its shareholders.  *See*

10   Prelim. Order at 6 ("An early settlement is thus the best way to achieve the corporate

11   reforms sought without incurring inordinate fees and making bilateral agreement

12   decreasingly likely").

13
     **D.    The Settlement Was Negotiated by the Parties with a Thorough**
14   **Understanding of the Strengths and Weaknesses of the Parties'**
     **Respective Positions**

15       43.    The stage of the proceedings and discovery is another factor which

16   courts consider in approving a settlement.  Through Plaintiffs' Counsel's substantial

17   efforts, they were able to credibly evaluate the Actions and the propriety of settling

18   at this stage.    Plaintiffs' Counsel conducted an extensive investigation of the

19   allegations asserted in the Actions, which included: (a) reviewing Puma's press

20   releases, public statements, SEC filings, and securities analysts' reports and

21   advisories about the Company, its financial condition, and the status and results of

22   Puma's research and development efforts relating to its drug, neratinib; (b) reviewing

23   related media reports about the Company; (c) researching applicable law with respect

24   to the claims alleged in the Actions and potential defenses thereto; (d) researching

25   and preparing correspondence related to Plaintiff's Litigation Demand; (e) preparing

26   and filing derivative complaints; (f) reviewing internal, Company documents that

27   had been produced in connection with the related Securities Action; (g) conducting

28

DECLARATION OF ASHLEY R. RIFKIN ISO PS' MOTION FOR FINAL APPROVAL OF SETTLEMENT
Case No. 8:18-cv-00236-AG-JCG

damages analyses; (h) reviewing and analyzing relevant filings in the Securities Action; (i) thoroughly evaluating Puma's corporate governance structures, policies, and reviewing the academic and industry literature and best practices to develop the Reforms negotiated for the Company; (j) engaging in months of telephonic and written exchanges that led to an agreement in principle on the material terms of the Settlement; (k) participating in a day-long, in-person mediation (and several follow-up discussions); and (*l*) drafting, reviewing, and exchanging briefs and other documents detailing the Parties' respective positions. Stip., §II.

44.   Plaintiffs' Counsel's thorough investigation, which included the efforts described above as well as counsel's past experience in litigating complex derivative actions, provided Plaintiffs with a clear picture of the strengths and weaknesses of the Actions.   Having enough information to properly evaluate the claims and defenses, Plaintiffs have resolved the Actions on a highly favorable basis to Puma and its shareholders.

**E.   The Experience and Views of Counsel Favor Approval**

45.   Significant weight should be attributed to the belief of experienced counsel that settlement is in the best interest of the Company.   As set forth above, the Settlement is the product of hard-fought, arm's-length negotiations by counsel with a comprehensive understanding of the relevant facts and law and the relative strengths and weaknesses of the claims and defenses.   Plaintiffs' Counsel are highly experienced in shareholder derivative litigation, have litigated scores of shareholder derivative actions to successful resolution and are nationally recognized as leaders in the field of shareholder rights litigation.   Plaintiffs' Counsel used their expertise to effectively and efficiently prosecute the Actions and reach an outstanding result for Puma and its shareholders.   Thus, Plaintiffs' Counsel's well-informed recommendations strongly support approval of the Settlement.

- 14 -

## IV.   THE SEPARATELY NEGOTIATED ATTORNEYS' FEES AND EXPENSES SHOULD BE APPROVED

46.   Plaintiffs' Counsel's efforts in prosecuting the Actions on behalf of the Company and negotiating the Settlement have conferred a substantial benefit upon Puma.   In light of the substantial benefits achieved, Puma has agreed to pay $1,175,000 for Plaintiffs' Counsel's attorneys' fees and expenses, subject to Court approval.  Stip., §VI.

### A.   Unopposed Fees Negotiated at Arm's-Length Are Favored

47.   The U.S. Supreme Court has endorsed this type of consensual resolution of attorneys' fees issues as the ideal toward which litigants should strive.  *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("A request for attorney's fees should not result in a second major litigation.  Ideally, of course, litigants will settle the amount of a fee.").   Applying these principles to derivative settlements, courts have approved separately negotiated attorneys' fees provisions and deferred to corporate directors' business judgment as to the amount of attorneys' fees to be paid to plaintiffs' counsel based upon the substantial benefits conferred upon the corporation.  *See, e.g.*, *City of Westland Police & Fire Ret. Sys. v. Sonic Sols.*, No. C 07-0511-CW, slip op., ¶¶5, 9 (N.D. Cal. Apr. 8, 2010) (approving attorneys' fee provision separately negotiated by independent directors) (attached hereto as Exhibit E).

48.   Here, the Settling Parties negotiated the Fee and Expense Amount after the principal terms of the Settlement were agreed upon, with the assistance of the Mediator.  As the Mediator observed, "[b]ased on the quality of advocacy during the mediation process, I can attest from firsthand knowledge that the Fee and Expense Amount was reached through hard fought, arm's-length negotiations conducted in good faith by highly skilled counsel with extensive experience in shareholder derivative litigation."  Declaration of Gregory P. Lindstrom in Support of Plaintiff's Motion for Final Approval of Derivative Settlement, ¶11, attached as Exhibit B hereto.

- 15 -

49.     The Settling Parties' negotiations were based upon a knowledgeable analysis of what an appropriate fee would be for the benefits achieved and the fees awarded in similar situations.  Plaintiffs' Counsel negotiated with their adversaries, who are attorneys employed by some of the most respected firms in the country, have litigated complex shareholder actions for many years, and know the applicable law pertaining to fee awards.   In such circumstances, the end result of those negotiations—reflecting all Settling Parties' experiences as to what is appropriate—is entitled to a great deal of judicial weight.  *See In re Apple Comput., Inc. Derivative Litig.*, No. C 06-4128 JF (HRL), 2008 WL 4820784, at *3 (N.D. Cal. Nov. 5, 2008) (recognizing that the participation of a mediator and the "involvement of multiple counsel from different firms suggests a lack of collusion," and that a "court should refrain from substituting its own value for a properly bargained-for agreement").

**B.     The Fee and Expense Amount Is Fair and Reasonable in Light of the Substantial Benefits Obtained**

50.     Under the "substantial benefit" doctrine, counsel who prosecute a derivative action that confers benefits on the corporation are entitled to an award of attorneys' fees and costs.  *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 395-96 (1970) ("a corporation may receive a 'substantial benefit' from a [stockholders' action], justifying an award of counsel fees, regardless of whether the benefit is pecuniary in nature," and that "regardless of the relief granted, private stockholders' actions of this sort 'involve corporate therapeutics,' and furnish a benefit to all shareholders....").

51.     The Settlement achieved by Plaintiffs' Counsel provides for the implementation of comprehensive corporate governance reforms that will not only prevent and deter recurrence of the alleged misconduct, but will also make the Puma Board members more effective representatives of Puma shareholders.  *See* Section IV.A. *supra*.  Although difficult to quantify, the therapeutic value of the Reforms and the Reforms' positive effect on the $890 million Company's intrinsic value are

- 16 -

substantial.[3]  *See Maher v. Zapata Corp.*, 714 F.2d 436, 461 (5th Cir. 1983) ("effects of the suit on the functioning of the corporation may have a substantially greater economic impact on it, both long- and short-term, than the dollar amount of any likely judgment").

52.     These substantial benefits warrant the requested Fee and Expense Amount, which is consistent with fees awarded in derivative settlements that achieved comparable, nonmonetary benefits.  *See In re Arena Pharm., Inc. S'holder Derivative Litig.*, No. 37-2010-00101051-CU-BT-CTL, slip op. (Cal. Super. Ct.-San Diego Cty. Dec 16, 2011) (awarding $1.1 million in fees for similarly comprehensive governance that did not include some of the key reforms achieved here, including a new director and newly created Board-level committee), Rifkin Decl., Ex. G; *In re Mannkind Corp. Derivative Litig.*, No. 11-cv-05003-GAF-SSx, slip op. (C.D. Cal. Nov. 19, 2012) (awarding approximately $1,250,000 in fees, comprised of $800,000 in cash and approximately $450,000 worth of stock, for similarly comprehensive governance that included a management-level Disclosure Committee, but did not include some valuable reforms achieved here, including a new director), Rifkin

---

[3]  A major survey of institutional investors conducted by McKinsey & Company showed that "[a]n overwhelming majority of investors are prepared to pay a premium for companies exhibiting high governance standards.  Premiums averaged 12-14% in North America and Western Europe."  *McKinsey Investor Opinion Survey*, McKinsey & Company (July 2002) available at http://www.eiod.org/uploads/publications/pdf/ii-rp-4-1.pdf (finding that "[a]fter strengthening corporate transparency, investors believe companies should create more independent boards and achieve greater boardroom effectiveness through such steps as better director selection, more disciplined board evaluation processes and greater time commitment from directors"); *see also Beyond the Numbers: The Materiality of Corporate Governance*, Deutsche Bank (Nov. 25, 2005) available at http://www.unepfi.org/fileadmin/documents/materiality2/governance_db_2005.pdf.  (5-year analysis of 2,000 public companies shows good governance is material to public companies' equity risk premium; shareholders expect that the quality of governance "will ultimately be reflected in a company's operating performance metrics").

Decl., Ex. H; *Hess v. Heckmann*, No. INC 10010407, slip op. (Cal. Super. Ct.-Riverside Cty., June 24, 2013) (awarding approximately $2.33 million worth of stock and approximately $300,000 in cash for similarly comprehensive governance that included creation of a Disclosure Committee and similar enhancements to Board independence), Rifkin Decl., Ex. I.

53.   There is no question that the proposed Settlement and the Reforms are the direct result of Plaintiffs' Counsel's vigorous efforts and provide substantial benefits to Puma.  Stip., ¶2.1 ("Puma and the Individual Defendants acknowledge and agree that the corporate governance reforms … are significant and extensive and confer substantial benefits upon Puma and its shareholders" and that "the prosecution and settlement of the Actions was a substantial and material factor in the Company's decision to adopt and/or implement the corporate governance reforms"). Accordingly, the Fee and Expense Amount negotiated by Puma, with the aid of counsel and an experienced Mediator, and approved by the independent directors, should be approved.

### C.   A Lodestar Cross-Check Supports the Fairness and Reasonableness of the Fee and Expense Amount

54.   In total, Plaintiffs' Counsel expended 1,260.42 hours on the investigation, prosecution, and resolution of the Actions for an aggregate lodestar of $666,357.25.

55.   In addition, Plaintiffs' Counsel incurred a total of $24,413.27 in unreimbursed expenses in connection with the prosecution and settlement of the Actions.  These expenses were reasonably necessary in the prosecution of these Actions and are of the type courts have typically found should be reimbursed when a benefit is conferred on a corporation and its stockholders in a derivative settlement.

56.   Overall, Plaintiffs' Counsel's fee request results in a multiplier of approximately 1.76 on Plaintiffs' Counsel's total lodestar in the Actions.   The

- 18 -

1  multiplier here falls well within the range of multipliers awarded in other complex

2  cases by courts that obtained similar relief.

3                 **1.**      **Robbins Arroyo's Time and Expenses in This Action**

4        57.     Robbins Arroyo undertook this litigation on an entirely contingent basis

5  and has not been paid for any of its work, nor have any of its costs or expenses been

6  reimbursed.  Robbins Arroyo undertook the litigation with the expectation that it

7  would have to devote many hours of hard work to the prosecution of a case involving

8  complex factual and legal issues without any guarantee of successful resolution or of

9  compensation for its efforts.  Robbins Arroyo diligently investigated the claims and

10  pursued the litigation with appropriate aggressiveness, and successfully and

11  efficiently brought the litigation to an amicable resolution.  The prosecution of the

12  litigation involved the expenditure of significant resources, including the time spent

13  by attorneys and professional staff, as well as the substantial expenses that were

14  incurred during the litigation, for which Robbins Arroyo received no compensation

15  during the course of litigation.

16        58.    The total number of hours spent on the litigation by Robbins Arroyo is

17  759.75.[4]  The total lodestar amount based on Robbins Arroyo's current rates is

18  $351,970.  The schedule was prepared from contemporaneous, daily time records

19  prepared and maintained by my firm.  The hourly rates shown below are the usual

20  and customary rates charged in all of our cases.  A breakdown of the lodestar is as

21  follows:

| NAME / DESIGNATION | YEARS OF EXPERIENCE | HOURLY RATE | HOURS | AMOUNT |
|---|---|---|---|---|
| **PARTNERS** | | | | |
| Brian J. Robbins | 21 | $825 | 67.75 | $55,893.75 |

[4] I exercised my discretion and did not include certain time of other attorneys and staff who worked on (but played a minor role in) the prosecution of this litigation.

DECLARATION OF ASHLEY R. RIFKIN ISO PS' MOTION FOR FINAL APPROVAL OF SETTLEMENT
Case No. 8:18-cv-00236-AG-JCG

| | | | | |
|---|---|---|---|---|
| Ashley R. Rifkin | 12 | $700 | 264.75 | $185,325.00 |
| Gregory E. Del Gaizo | 12 | $700 | 15.00 | $10,500.00 |
| **ASSOCIATES** | | | | |
| Darnell R. Donahue | 7 | $400 | 24.75 | $9,900.00 |
| **STAFF ATTORNEYS** | | | | |
| Bradley J. Muldrow | 4* | $300 | 71.75 | $21,525.00 |
| Maureen E. Forsyth | 11* | $300 | 48.50 | $14,550.00 |
| Ashton S. Cohen | 1* | $250 | 35.00 | $8,750.00 |
| **PARALEGALS** | | $228.75** | 73.25 | $17,208.75 |
| **CORPORATE RESEARCH**[5] | | $176.53** | 159 | $28,317.50 |
| **TOTALS:** | | | **759.75** | **$351,970.00** |

*Reflects years of experience at time work was performed, as such individuals no longer work for Robbins Arroyo

**Average Hourly Rate

59.     A more fulsome discussion of the qualifications and backgrounds of the current Robbins Arroyo attorneys identified above may be found in Robbins Arroyo's firm resume, which is attached as Exhibit A hereto.

60.     All of the work performed by Robbins Arroyo was reasonably necessary in the investigation, prosecution, and settlement of this litigation.   A significant

---

[5] Robbins Arroyo's Corporate Research Department consists of a group of trained professionals dedicated to investigating various acts of corporate malfeasance.  The Corporate Research team conducted substantial factual research and investigation, including, among other things:  researching and identifying facts that formed the basis of the allegations; monitoring, analyzing, and circulating to the members of the litigation team relevant public filings, media articles, pleadings in the Securities Action, and other public information; researching and identifying relevant information concerning Puma's existing corporate governance structure; and conducting research into and analysis of the damages suffered by Puma as a result of the wrongdoing.  The non-attorney time devoted to this matter by the Corporate Research team substantially reduced the number of attorney hours required to effectively prosecute the action and reduced Robbins Arroyo's average effective billing rate and lodestar.

majority of the work Robbins Arroyo devoted to the litigation was focused in the following areas, among others:

    (a)   Factual investigation into the allegations, which included reviewing Puma's press releases, public statements, SEC filings, media reports, and securities analysts' reports and advisories about the Company, its financial condition, and the status and results of Puma's research and development efforts relating to its drug, neratinib;

    (b)   Reviewing and analyzing relevant documents in the Securities Action, including the briefing on the motions to dismiss and motions for summary judgment and the related opinions and orders of this Court;

    (c)   Researching applicable law with respect to the claims alleged and potential defenses thereto and conducting damages analyses;

    (d)   Preparing Plaintiff's Litigation Demand and related correspondence, as well as researching applicable law to determine whether Plaintiff's Litigation Demand was wrongfully refused;

    (e)   Preparing Plaintiff's complaint, which included the thorough factual and legal research discussed above, as well as further investigation into, among other things, potential conflicts of interest among the Defendants and whether diversity existed among the Parties;

    (f)   Coordinating with Defendants and preparing joint status reports and stipulations to ensure the Action proceeded efficiently;

    (g)   Performing efficient and targeted searches through Defendants' production of over 1.2 million pages of documents (which had been produced in connection with the related Securities Action),

DECLARATION OF ASHLEY R. RIFKIN ISO PS' MOTION FOR FINAL APPROVAL OF SETTLEMENT
Case No. 8:18-cv-00236-AG-JCG

and then reviewing and analyzing tens of thousands of pages of documents that included emails among the Defendants regarding the results of the Company's clinical trials, Board and committee meeting minutes, presentations provided to the Board on the status and results of the Company's clinical trials, and other clinical trial materials;

(h) Reviewing and analyzing Puma's corporate governance documents, including committee charters and other internal corporate documents concerning Puma's policies and procedures and internal controls relating to, among other things, oversight over Puma's research and development efforts and related disclosures; and researching academic and industry literature and best practices applicable to pharmaceutical company's like Puma in order to develop the Reforms negotiated for Puma;

(i) Mediation/settlement efforts, including preparing Plaintiff's settlement demand letter, which relied on the in-depth corporate governance research described above and numerous telephonic and written correspondence with the Defendants to negotiate the Reforms; preparation of Plaintiff's mediation statement and attendance at a full day mediation before the Mediator, and several further settlement negotiations to reach an agreement in principal and then finalize the Stipulation;

(j) Preparing the papers in support of preliminary and final approval of the Settlement, and coordinating with the plaintiffs' counsel in the related derivative actions regarding the papers in support of Settlement.

- 22 -

61.     The hourly rates charged by Robbins Arroyo are reasonable for several reasons.  First, the rates charged by Robbins Arroyo are its customary hourly rates.

62.     Second, the hourly rates charged by Robbins Arroyo are reasonable in light of its highly specialized skill and experience, and national reputation in shareholder litigation.  Robbins Arroyo is among the most experienced and skilled practitioners in the shareholder litigation field.  Robbins Arroyo has served as lead or co-plaintiffs' counsel in numerous securities and complex litigation matters, including serving as lead or co-plaintiffs' counsel in hundreds of stockholder derivative and class actions in state and federal courts across the country.  *See* Ex. A.

63.     Third, we are familiar with the usual and customary billing rates typically charged by attorneys and paralegals in shareholder and derivative litigation, and the rates charged by Robbins Arroyo are usual and customary for such litigation and consistent with the rates by lawyers of comparable skill, experience, and national reputation.

64.     Fourth, the hourly rates charged by Robbins Arroyo are within the range of those approved by the Court in other litigation.   *Rodriguez v. Cty. of L.A.*, 96 F. Supp. 3d 1012, 1023 (C.D. Cal. 2014) (approving rates from $500 to $975 per hour as reasonable in complex civil rights litigation).

65.     Fifth, the implied hourly rate of approximately $463 charged by Robbins Arroyo's attorneys falls well within the range of those approved by the Delaware Court of Chancery, which has a national recognition for its expertise in corporate and shareholder litigation.  *See Espinoza v. Zuckerberg, et al.*, C.A. No. 9745-CB, Affidavit of Jenny L. Dixon in Support of Motion for Approval of Proposed Settlement and Application for an Award of Attorneys' Fees and Expenses, ¶65 (Del. Ch. Mar. 9, 2016) (reflecting plaintiff's counsel's request for attorneys' fees that equated to an implied hourly rate of $676.12) and *id.* Order and Final Judgment (Del. Ch. Mar. 9, 2016) (approving foregoing request for attorneys' fees) attached

hereto as Exhibit F. Because Robbins Arroyo actively litigates shareholder derivative and class action litigation in the Delaware Court of Chancery, I believe that the hourly rates approved in this venue serve as a meaningful gauge of the market value for my firm's services.

66.  To date, Robbins Arroyo has incurred a total of $8,750.03 in unreimbursed expenses in connection with the prosecution and settlement of the litigation. The expenses are broken down as follows:

| DISBURSEMENT | TOTAL |
|---|---|
| Travel | $16.07 |
| Photocopies | $1,013.75 |
| Communications & Messaging | $762.68 |
| Research & Investigation | $1,758.23 |
| Filing/Service Fees | $499.30 |
| Mediation Fees | $4,700.00 |
| *TOTAL* | *$8,750.03* |

67.  The expenses incurred by Robbins Arroyo are reflected in the books and records of my firm. These books and records are prepared from expense vouchers, check records, and other source materials and are an accurate record of the expenses incurred. These expenses were reasonably necessary in the prosecution of this litigation.

68.  The expenses for which Robbins Arroyo seeks payment are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These expenses include, among others, fees paid in connection with the mediation, research, and investigative costs (for example, costs incurred through Bloomberg, Pacer, and Westlaw), as well as mailing and printing costs, filing fees, and transportation.

### 2. Counsel's Time and Expenses in the Related Derivative Actions

69. The time and expenses incurred by the plaintiffs' counsel in the related derivative actions are detailed in the Declaration of Timothy Brown in Support of Plaintiff's Motion for Final Approval of Derivative Settlement ("Brown Declaration") and the Declaration of Laurence M. Rosen in Support of Plaintiff's Motion for Final Approval of Derivative Settlement ("Rosen Declaration"), attached hereto as Exhibits C-D.

70. The Brown Declaration reflects that the number of hours spent on the litigation by The Brown Law Firm, P.C. is 426.66, with a total lodestar amount of $264,717.50. The Brown Declaration also reflects that The Brown Law Firm has incurred a total of $10,495.75 in unreimbursed expenses in connection with the prosecution and settlement of the litigation.

71. The Rosen Declaration reflects that the number of hours spent on the litigation by The Rosen Law Firm, P.A. is 74.01, with a total lodestar amount of $49,669.01. The Rosen Declaration also reflects that The Rosen Law Firm has incurred a total of $5,167.49 in unreimbursed expenses in connection with the prosecution and settlement of the litigation.

### D. The Service Awards Requested by Plaintiffs Are Reasonable

72. Plaintiffs respectfully request that the Court approve service awards of $1,500 each, to be paid from the amount of fees awarded by the Court, in recognition of the substantial benefits they have helped create for Puma. Stip., ¶4.2. Here, Plaintiff devoted time and effort to initiating and diligently supervising this litigation, including reviewing the Litigation Demand and complaint, and engaging in correspondence with counsel regarding the allegations in this action and the related Securities Action. Plaintiff also willingly undertook certain responsibilities and risks that go along with publicly litigating this representative action on behalf of

1  Puma. The modest service award, to be deducted from the Fee and Expense
2  Amount, should therefore be approved.

3  **V.  CONCLUSION**

4  73.  The Settlement is fair, reasonable, and adequate, confers substantial
5  benefits on Puma through the adoption of valuable corporate governance changes,
6  and should be approved in its entirety.

7  74.  Attached hereto are true and correct copies of the following Exhibits:

8  Exhibit A:  Robbins Arroyo LLP Resume;

9  Exhibit B:  Declaration of Gregory P. Lindstrom in Support of Plaintiff's
10            Motion for Final Approval of Derivative Settlement;

11  Exhibit C:  Declaration of Timothy Brown in Support of Plaintiff's Motion
            for Final Approval of Derivative Settlement;

12  Exhibit D:  Declaration of Laurence M. Rosen in Support of Plaintiff's
13            Motion for Final Approval of Derivative Settlement;

14  Exhibit E:  *City of Westland Police & Fire Ret. Sys. v. Sonic Sols.*, No. C 07-
            0511-CW, slip op. (N.D. Cal. Apr. 8, 2010);

15  Exhibit F:  *Espinoza v. Zuckerberg, et al.*, C.A. No. 9745-CB, Affidavit of
16            Jenny L. Dixon in Support of Motion for Approval of Proposed
            Settlement and Application for an Award of Attorneys' Fees and
17            Expenses (Del. Ch. Mar. 9, 2016) and Order and Final Judgment
            (Del. Ch. Mar. 9, 2016);

18  Exhibit G:  *In re Arena Pharm., Inc. S'holder Derivative Litig.*, No. 37-2010-
19            00101051-CU-BT-CTL, slip op. (Cal. Super. Ct.-San Diego Cty.
            Dec 16, 2011);

20  Exhibit H:  *In re Mannkind Corp. Derivative Litig.*, No. 11-cv-05003-GAF-
21            SSx, slip op. (C.D. Cal. Nov. 19, 2012);

22  Exhibit I:  *Hess v. Heckmann*, No. INC 10010407, slip op. (Cal. Super. Ct.-
            Riverside Cty., June 24, 2013);

23  Exhibit J:  *In re Hewlett-Packard Co. Securities Litig.*, No. CV-11-01404-
24            AG, Reporter's Transcript of Proceedings Motion Hearing (C.D.
            Cal. Dec. 10, 2014);

25  Exhibit K:  *In re Integrated Silicon Solution, Inc., S'holder Derivative Litig.*,
26            No. C-06-04387-RMW, Joint Declaration of Robin Winchester
            and Jeffrey J. Angelovich in Support of Motion for Final
27            Approval of Derivative Settlement (N.D. Cal., May 26, 2009) and
            Final Judgment and Order of Dismissal with Prejudice (N.D. Cal.,
28            June 9, 2008); and

- 26 -

Exhibit L:   *In re Arena Pharm., Inc. S'holder Derivative Litig.*, No. 37-2010-00101051-CU-BT-CTL, Declaration of Ashley R. Palmer in Support of Plaintiffs' Unopposed Motion for Final Approval of Shareholder Derivative Settlement (Cal. Super. Ct.-San Diego Cty. Dec. 9, 2011) and Final Order of Dismissal with Prejudice and Judgment (Dec. 16, 2011).

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed this 17th day of December, 2018, at San Diego, California.


*/s/ Ashley R. Rifkin*
ASHLEY R. RIFKIN

1314398

- 27 -

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 17, 2018, I authorized the electronic filing of the foregoing DECLARATION OF ASHLEY R. RIFKIN IN SUPPORT OF PLAINTIFF'S MOTION FOR FINAL APPROVAL OF DERIVATIVE SETTLEMENT, and all attachments thereto, with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List for this action.

I further certify that I caused a copy of the foregoing to be sent via e-mail to the following parties:

Colleen C. Smith
**LATHAM & WATKINS LLP**
12670 High Bluff Drive
San Diego, CA 92130
colleen.smith@lw.com

Michele D. Johnson
**LATHAM & WATKINS LLP**
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
michele.johnson@lw.com

*s/ Ashley R. Rifkin*
ASHLEY R. RIFKIN

- 28 -